Jane W. Duke, Ark. Bar No. 96190
Christopher D. Plumlee, Ark. Bar No. 96154
**MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.**
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone: (501) 688-8842
Facsimile: (501) 918-7842
Email: jduke@mwlaw.com

Michael A. Carvin (*pro hac admission pending*)
Ryan J. Watson (*pro hac admission pending*)
**JONES DAY**
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
Email: macarvin@jonesday.com
       rwatson@jonesday.com

*Attorneys for Plaintiffs*

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
MAY 30 2014
JAMES W. McCORMACK, CLERK
By:

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF ARKANSAS
# WESTERN DIVISION

| | |
|---|---|
| DIGITAL RECOGNITION NETWORK, INC.; VIGILANT SOLUTIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MIKE BEEBE, *in his official capacity as Governor of the State of Arkansas*; DUSTIN McDANIEL, *in his official capacity as Attorney General of the State of Arkansas*, <br><br> Defendants. | **PLAINTIFFS' COMPLAINT** <br><br> Civil No. 4:14cv0327-SWW <br><br><br> This case assigned to District Judge Wright <br> and to Magistrate Judge Young |

## COMPLAINT

Plaintiffs Digital Recognition Network, Inc. ("DRN") and Vigilant Solutions, Inc.

("Vigilant"), through their undersigned attorneys, bring this civil action against Defendant Mike

Beebe, in his official capacity as Governor of the State of Arkansas, and Defendant Dustin

1

McDaniel, in his official capacity as Attorney General of the State of Arkansas, and allege as follows:

## Summary of the Action

1. DRN uses photographs and image-content analysis techniques to serve the financial services, insurance, and vehicle repossession industries. Because DRN and others use such techniques in an effort to locate specific content within a photograph—namely, the alphanumeric content printed on a license plate—the application of this technology that is at issue here has sometimes been referred to as "automatic license plate reader" ("ALPR") technology.

2. DRN's ALPR systems, which are typically mounted on tow trucks, take photographs that include nearby vehicles' license plates. DRN then disseminates the resulting license-plate data to its clients and partners, which use the data for purposes such as identifying cars that should be repossessed and locating cars that have been stolen or fraudulently reported as stolen.

3. DRN also provides captured license-plate data to Vigilant, which then shares the data with law enforcement agencies for purposes that range from utilizing near real-time alerts for locating missing persons and stolen vehicles to the use of historical license-plate data to solve crimes.

4. DRN and Vigilant bring this action under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201 and 2202, to have the Court declare that the Arkansas Automatic License Plate Reader System Act ("the Act"),[1] which prohibits Plaintiffs' use of ALPR systems, violates Plaintiffs' freedom of speech under the First and Fourteenth Amendments of the Constitution of the United States.

---

[1] 2013 Ark. Acts 1491 (codified at Ark. Code § 12-12-1801 *et seq.*).

5. DRN and Vigilant further seek a preliminary injunction against the application or enforcement of the Act so that they can resume their constitutionally protected speech—namely, the dissemination and collection of license-plate data using ALPR systems—in Arkansas.

6. DRN and Vigilant further seek a permanent injunction against the application or enforcement of the Act.

7. The Act prohibits Plaintiffs from using ALPR systems to photograph a license plate and from disseminating that license-plate data to their clients and partners, thus impermissibly restricting Plaintiffs' constitutionally protected speech.

**The Parties**

8. Plaintiff DRN, which commenced business in 2007, is a Delaware corporation. DRN's principal office is located at 4150 International Plaza, Suite 800, Fort Worth, TX 76109.

9. Plaintiff Vigilant, which was founded in 2005, is a Delaware corporation. Vigilant's headquarters is located in Livermore, California.

10. Defendant Mike Beebe is Governor of the State of Arkansas. As the chief executive of the State of Arkansas, the Governor is responsible for the execution and enforcement of the State's laws. *See* Ark. Const. Art. VI, § 2. The Governor acts under color of law and is sued in his official capacity.

11. Defendant Dustin McDaniel is Attorney General of the State of Arkansas. "The Attorney General is Arkansas's chief law enforcement officer" and is "committed to protecting and defending the interests of all Arkansans." *Arkansas Attorney General: Our Office—Departments, at* http://arkansasag.gov/our-office/departments/ (last visited May 24, 2014). The Attorney General acts under color of law and is sued in his official capacity.

**Jurisdiction and Venue**

12. This action arises under 42 U.S.C. § 1983 and the First Amendment to the Constitution of the United States, as made applicable to the states by the Fourteenth Amendment.

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a).

14. Plaintiffs also seek declaratory and injunctive relief under 28 U.S.C. §§ 2201-02, Federal Rule of Civil Procedure 57, and Federal Rule of Civil Procedure 65.

15. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this action occurred or will occur in this District and, upon information and belief, the Defendants reside within the State of Arkansas and within this District.

**Additional Allegations**

I. **DRN And Vigilant Wish To Resume Their Use Of ALPR Systems To Disseminate And Collect License-Plate Data Within Arkansas.**

16. Vigilant develops technology that analyzes photographs and looks for specific content that might be contained within the photograph. At the most basic level, image-content analysis is the extraction of meaningful information from a photograph, and it can be achieved by either a human or by a machine such as a digital camera, mobile phone, computer, processor, or electrical circuit. Vigilant executives have developed image-content analysis techniques for various markets, including techniques for optical character recognition, pattern recognition, and motion detection.

17. The technique developed by Vigilant involving the use of Optical Character Recognition ("OCR") is the subject of this suit. In one of its applications of image-content analysis, Vigilant utilizes a Digital Signal Processor ("DSP") to convert analog camera output (a photograph) into a digital photograph that can then be analyzed by DSP algorithms to determine

if the image contains a pattern that could be representative of a rectangle containing alphanumeric characters (*i.e.*, a possible license plate). Upon location of a possible license plate within an image, the DSP disregards all other aspects of the photograph and performs additional de-skewing, normalization, and character segmentation processes in an effort to improve the chances of successful interpretation or recognition of the printed alphanumeric text contained within the depicted rectangle. The DSP then utilizes OCR algorithms to convert images of text (*i.e.*, alphanumeric characters) printed on the license plate from being only human readable depictions of text to being both human-readable and computer-readable text. As noted above, these types of applications have sometimes been labeled within the industry as "automatic license plate reader" or "ALPR" systems.[2]

18. DRN uses image-content analysis technology developed by Vigilant to serve the automobile finance, automobile insurance, and vehicle repossession industries. DRN cameras, which are typically mounted on tow trucks or vehicles owned by repossession companies, automatically photograph everything the camera-equipped vehicle passes during its daily routine of driving on the public streets of its respective city or town looking for vehicles to repossess (for automobile lenders), while simultaneously looking for vehicles that have been reported stolen (for insurance carriers).[3]

19. Once an ALPR system converts the license-plate image into computer-readable text, software simultaneously cross-checks the alphanumeric characters from the license plate

---

[2] They are also known within the industry as follows: Automatic Number Plate Recognition (ANPR), Automatic Vehicle Identification (AVI), Car Plate Recognition (CPR), License Plate Recognition (LPR), and Mobile License Plate Recognition (MLPR). From a purely technical standpoint, ALPR technology is not really a technology, but rather is an application within the field of image-content analysis that utilizes a technique or technology known as OCR.

[3] The companies that mount DRN's ALPR systems on their vehicles are referred to as DRN's "camera affiliates."

against a database of license plates registered to vehicles that are sought for repossession by lending institutions that DRN serves. DRN then disseminates the matching license-plate data to its clients, which include automobile lenders and insurance companies. DRN earns substantial revenue by selling this license-plate data to its clients.

20. When there is a match between the captured license-plate data and the database, software alerts the driver that the vehicle is subject to repossession and prompts the driver to call a dispatch number to verify that the vehicle is still subject to repossession. If the vehicle is verified as still being subject to repossession, then the DRN camera affiliate is authorized to repossess the vehicle.

21. The ALPR cameras date and time-stamp each digital photograph, as well as recording the GPS coordinates that indicate where the photograph was taken. When this information is captured by a computer in the vehicle, it is uploaded in real time to DRN's data center, where it is stored and processed for use by DRN to aid in recovering vehicles for lending institutions and insurance carriers.

22. The data that DRN's ALPR systems collect—a photograph of the license plate, as well as the date, time, and location—do not contain any personally identifiable information such as the name, address, or phone number of the registered owner. License-plate data thus cannot be linked to a specifically identifiable person unless it is combined with other data, such as records maintained by a state's department of motor vehicles. Access to such motor-vehicle records is, however, strictly regulated by the federal Drivers Privacy Protection Act ("DPPA") and various state laws. For example, the DPPA "establishes a regulatory scheme that restricts the States' ability to disclose a driver's personal information without the driver's consent." *Maracich v. Spears*, 133 S. Ct. 2191, 2198 (2013) (internal quotation marks omitted) (citing 18

U.S.C. §§ 2721(a)(1), (a)(2)). In addition, Arkansas law restricts access to drivers' motor-vehicle records. *See* Ark. Code §§ 27-50-906, 27-50-907(b)(1).

23. Many law enforcement agencies utilize ALPR systems to assist in locating stolen vehicles, missing persons, and terror suspects, as well as to assist in drug and human trafficking cases.

24. Plaintiffs' clients and partners use license-plate data captured by ALPR systems for purposes such as identifying cars that should be repossessed, locating cars that have been stolen or fraudulently reported as stolen, and assisting law enforcement in finding kidnapped children and stolen vehicles.

25. DRN has a partnership with Vigilant's National Vehicle Location Service, through which DRN's ALPR data is made available to law enforcement agencies—usually at no cost to the agencies. DRN's data thus assists law enforcement in locating missing persons and finding stolen vehicles.

26. Prior to passage of the Act, DRN had sold a total of three ALPR camera kits to three companies operating in Arkansas. Specifically, Arkansas Repossessors, Absolute Towing, and Recovery & Remarketing each purchased one kit for the price of $15,825.

27. Prior to the Act's effective date, Arkansas Repossessors and Absolute Towing had begun operating DRN's camera kits in Arkansas.

28. Prior to the effective date of the Act, DRN was collecting ALPR data in Arkansas and disseminating the data to its clients and partners—including Vigilant, which was then sharing the data with law enforcement agencies.

29. Prior to the effective date of the Act, DRN sold license-plate data collected by ALPR systems in Arkansas to clients such as automobile lenders and insurance companies, thus generating revenue for DRN.

30. In addition, prior to the effective date of the Act, Vigilant served law enforcement agencies in Arkansas. These law enforcement agencies accessed Vigilant's ALPR data network for the purposes of locating vehicles of interest to law enforcement investigations.

31. Prior to the effective date of the Act, when law enforcement agencies in Arkansas made queries against Vigilant's data, the data sometimes resulted in investigative leads. Vigilant's data thus assisted law enforcement in efforts such as locating fugitives, locating abducted children, and investigating and solving a variety of major crimes. In many (if not all) cases, Vigilant provided this data free of charge.

32. As a result of the Act, DRN's Arkansas camera affiliates have stopped using their ALPR systems, which are the source of DRN's license-plate data. Moreover, because of the Act, DRN can no longer disseminate or sell license-plate data collected by ALPR systems in Arkansas. Additionally, the Act precludes DRN from selling additional camera kits in Arkansas to camera affiliates such as repossession companies. Because of the Act, DRN also refunded the payments that one of its Arkansas camera affiliates had made for a camera kit. The Act also prohibits Vigilant from receiving DRN's Arkansas-based license-plate data and from disseminating this data to law enforcement agencies. In short, Plaintiffs' operations in Arkansas have ceased.

33. But for the Act, Plaintiffs and their affiliates would resume their collection and dissemination of captured license-plate data using ALPR systems within Arkansas. But for the Act, DRN and its camera affiliates would collect license-plate data using ALPR systems in

Arkansas, and DRN would then generate revenue by selling this data to clients such as automobile lenders and insurance companies. In addition, were it not for the Act, DRN would seek to sell additional camera kits in Arkansas, thus generating further revenue. Finally, but for the Act, Vigilant would receive Arkansas-based ALPR data from DRN and would disseminate it to law enforcement agencies.

II. **The Act Injures Plaintiffs By Preventing Them From Using ALPR Systems To Disseminate Or Collect License-Plate Data.**

34. The Act provides that, "[e]xcept as provided in subsection (b) of this section, it is unlawful for an individual, partnership, corporation, association, or the State of Arkansas, its agencies, and political subdivisions to use an automatic license plate reader system." Ark. Code § 12-12-1803(a). Section 12-12-1803(b), which contains the list of enumerated exceptions, states that "[a]n automatic license plate reader system may be used": (1) by "a law enforcement agency . . . for any lawful purpose"; (2) "[b]y parking enforcement entities for regulating the use of parking facilities"; or (3) for the purpose of "controlling access to secured areas." § 12-12-1803(b).

35. The Act defines an "[a]utomatic license plate reader system" as "a system of one (1) or more mobile or fixed automated high-speed cameras used in combination with computer algorithms to convert images of license plates into computer-readable data." § 12-12-1802(2).

36. Section 12-12-1803(a)'s prohibition on the "use" of an ALPR system precludes Plaintiffs from disseminating or disclosing license-plate data that is captured by an ALPR system. *See* § 12-12-1803(a).

37. Section 12-12-1803(a)'s ban on the "use" of ALPR systems also prevents Plaintiffs from using ALPR systems to collect license-plate data. *See* § 12-12-1803(a). In other words, Plaintiffs would violate this provision if they were to use "a system of one (1) or more

mobile or fixed automated high-speed cameras" to photograph a license plate and then were to utilize "computer algorithms to convert images of license plates into computer-readable data." § 12-12-1802(2); *see* § 12-12-1803(a).

38. Sections 12-12-1804 and 12-12-1805 contain restrictions on the disclosure, use, sharing, and retention of "[c]aptured plate data" that was obtained pursuant to one of the Act's enumerated exceptions. *See, e.g.*, § 12-12-1804(a) (imposing restrictions on "[c]aptured plate data obtained for the purposes described under Section 12-12-1803(b)"); §§ 12-12-1804(b), (c) (imposing restrictions on captured plate data obtained pursuant to the law enforcement exception); § 12-12-1805 (regulating "[a]n entity that uses an automatic license plate reader system under Section 12-12-1803(b)"). For example, Section 12-12-1804(a) provides that "[c]aptured plate data obtained for the purposes described under § 12-12-1803(b) shall not be used or shared for any other purpose and shall not be preserved for more than one hundred fifty (150) days." Additionally, Section 12-12-1804(d)(1) mandates that, "[e]xcept as provided under subdivision (d)(2) of this section, a governmental entity authorized to use an automatic license plate reader system under § 12-12-1803(b) shall not sell, trade, or exchange captured plate data for any purpose." § 12-12-1804(d)(1); *see* § 12-12-1804(d)(2) ("Captured plate data obtained by a law enforcement agency under § 12-12-1803(b)(1) that indicates evidence of an offense may be shared with other law enforcement agencies."). Section 12-12-1808(a)(1) also provides that "[c]aptured license plate data or data obtained from the Office of Motor Vehicles may be disclosed only: (A) To the person to whom the vehicle is registered; (B) After the written consent of the person to whom the vehicle is registered; or (C) If the disclosure of the data is permitted by the Driver Privacy Protection Act of 1994 . . . ." *Id.*

39. Section 12-12-1807(a) provides that a person who violates the Act "shall be subject to legal action for damages to be brought by any other person claiming that a violation of [the Act] has injured his or her business, person, or reputation." *Id.*

### III. The Act's Ban On Plaintiffs' Dissemination And Collection Of License-Plate Data Captured By An ALPR System Violates The First Amendment.

40. Plaintiffs' dissemination of license-plate information collected by ALPR systems is speech protected by the First Amendment. Similarly, the use of ALPR systems to collect and create information by taking a photograph amounts to constitutionally protected speech.

41. The Act is a content-based speech restriction. The illegality of speech under the statute turns on the *content* of what is being photographed and transmitted through ALPR systems—license-plate information is covered, but other content is not. The Legislature has singled out the collection and dissemination of "images of license plates" and the resulting "computer-readable data." Ark. Code § 12-12-1802(2), 12-12-1803(a); *see also* § 12-12-1082(3). Moreover, the Act's extensive exceptions further demonstrate that it discriminates based on the content of the speech and the identity of the speaker.

42. Because the Act's speech restrictions are content-based and speaker-based, they are subject to heightened scrutiny, which they cannot survive. In any event, the Act violates the protections afforded commercial speech against neutral regulation because the Act (1) does not further a substantial governmental interest, (2) does not directly and materially advance a governmental interest, and (3) restricts more speech than is necessary to further the governmental interest at issue. Moreover, even if a blanket ban on ALPR use would directly and materially advance a substantial interest, the Act's numerous gaps and exceptions fatally undermine the State's purported privacy interest and demonstrate that the Act cannot directly and materially advance that interest.

43. The State does not have a substantial interest in preventing persons from viewing or photographing license plates—or from disseminating the information collected when doing so—because license plates contain no private information whatsoever. Moreover, the photographic recording of government-mandated public license plates does not infringe any "privacy" interest that concededly is not infringed when the photographer views the plate. Thus, the State cannot carry its heavy burden to demonstrate that it has a substantial interest that is served by the Act.

44. The State cannot demonstrate that the Act directly and materially advances any privacy interest. If the State is seeking to prevent the dissemination of license-plate data in circumstances where that data might be combined with personal information derived from another source and then misused in some way, the Act's restriction on the use of ALPR systems is inherently an indirect means of furthering this purported privacy interest. Specifically, the Act's suppression of speech relating to publicly-displayed license plates in an effort to prevent misuse of private data that might theoretically be combined with license-plate information is too attenuated to survive scrutiny under *Central Hudson*. Moreover, the Act does not materially advance the State's purported privacy interest.

45. In addition, the speech restrictions in the Act are not adequately tailored because they are more extensive than necessary to serve any purported privacy interest that might be at stake here. For example, the Act bans Plaintiffs' use of an ALPR system merely to *collect* license-plate data, even if that data is never disseminated to another person.

46. When a statute imposes a selective ban on speech, the government must justify the distinctions and exceptions found in the statute based on its asserted rationale for regulating the speech. The Act is riddled with gaps and exceptions that arbitrarily permit a wide array of

speech that has precisely the same "privacy" implications as speech the statute prohibits. These exceptions dramatically undermine any claim that ALPR usage by entities such as Plaintiffs infringes privacy interests and any effort to show that the Act directly and materially advances any "privacy" interest.

## FIRST CLAIM FOR RELIEF

**Declaration That The Arkansas Automatic License Plate Reader System Act Violates the Free Speech Clause of the First Amendment to the United States Constitution**

47. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 46 as though fully set forth herein.

48. The Act violates the First and Fourteenth Amendments of the United States Constitution because it does not satisfy the heightened scrutiny given to content- and speaker-based speech restrictions and also because it does not further a substantial governmental interest, does not directly and materially advance any such interest, and is not narrowly tailored to further a substantial governmental interest.

49. The Act injures Plaintiffs by preventing them from exercising their First Amendment freedoms to disseminate and collect license-plate data captured by an ALPR system.

50. Declaring the Act invalid would remedy Plaintiffs' injury by freeing them to engage in constitutionally protected speech—namely, the collection and dissemination of license-plate data captured by an ALPR system.

## SECOND CLAIM FOR RELIEF

**Injunctive Relief Against Defendants**

51. Plaintiffs incorporate by reference the allegations set forth in paragraphs 1 through 50 as though fully set forth herein.

52. Under 42 U.S.C. § 1983, persons such as Defendants "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

53. As alleged in paragraphs 10-11, Defendants act under the color of state law as the Governor and Attorney General of the State of Arkansas in enforcing the Act in their official capacities.

54. But for the Act's unconstitutional restriction on speech, Plaintiffs and their camera affiliates would collect and disseminate captured license-plate data using ALPR systems.

55. The Act injures Plaintiffs by depriving them of their opportunity to engage in valuable speech by disseminating and collecting license-plate data using an ALPR system.

56. Enjoining the Act would remedy Plaintiffs' injury by freeing them to engage in constitutionally protected speech—namely, the dissemination and collection of license-plate data captured by an ALPR system.

57. Plaintiffs have no adequate remedy at law.

## Prayer for Relief

**WHEREFORE**, Plaintiffs DRN and Vigilant respectfully request that this Court grant the following relief:

A. A declaration that the Act's provisions, as well as any applicable rules and regulations regarding those provisions, violate the Free Speech Clause of the First Amendment;

B. Preliminary and permanent injunctions enjoining Defendants from applying or enforcing the Act's provisions, as well as any applicable rules and regulations regarding those provisions;

C. Costs and attorneys' fees pursuant to 42 U.S.C. § 1988 or any applicable statute or authority; and

D. Such other or further relief the Court deems to be just and appropriate.

Dated: May 30, 2014

Respectfully submitted,

*/s/ Jane W. Duke*
Jane W. Duke, Ark. Bar No. 96190
Christopher D. Plumlee, Ark. Bar No. 96154
MITCHELL, WILLIAMS, SELIG,
   GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
Telephone: (501) 688-8842
Facsimile: (501) 918-7842
Email: jduke@mwlaw.com

Michael A. Carvin*
Ryan J. Watson*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
macarvin@jonesday.com
rwatson@jonesday.com
*Attorneys for Plaintiffs*
*Applications for admission pro hac vice pending

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2014, a true and correct copy of the foregoing will be served on the following party via hand delivery, consistent with both Fed. R. Civ. P. 4(e)(2)(A) and 4(j)(2):

> Mike Beebe, Governor of the State of Arkansas
> State Capitol
> Room 250
> Little Rock, AR 72201

In addition, I hereby certify that on May 30, 2014, a true and correct copy of the foregoing was served on the following party via certified mail at the following address:

> Mike Beebe, Governor of the State of Arkansas
> State Capitol
> Room 250
> Little Rock, AR 72201

In addition, I hereby certify that on May 30, 2014, a true and correct copy of the foregoing will be served on the following party via hand delivery, consistent with Fed. R. Civ. P. 4(e)(2)(A), at the following address:

> Dustin McDaniel, Attorney General of the State of Arkansas
> Attorney General's Office
> 323 Center Street, Suite 200
> Little Rock, AR 72201

In addition, I hereby certify that on May 30, 2014, a true and correct copy of the foregoing was served on the following party via certified mail, consistent with Fed. R. Civ. P. 5.1(a)(2), at the following address:

> Dustin McDaniel, Attorney General of the State of Arkansas
> Attorney General's Office

323 Center Street, Suite 200
Little Rock, AR  72201

*Jane W. Duke*
Jane W. Duke, Ark. Bar No. 96190
MITCHELL, WILLIAMS, SELIG,
  GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas  72201
Telephone:  (501) 688-8842
Facsimile:  (501) 918-7842
Email:  jduke@mwlaw.com

2