**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

DIGITAL RECOGNITION                                                    PLAINTIFFS
NETWORK, INC. and
VIGILANT SOLUTIONS, INC.

VS.                              Case No.  4:14CV00327 BSM


MIKE BEEBE, in His Official Capacity as
Governor of the State of Arkansas; DUSTIN
MCDANIEL, in His Official Capacity as
Attorney General of the State of Arkansas                          DEFENDANTS


**BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE
TO MOTION FOR PRELIMINARY INJUNCTION**

The Arkansas General Assembly enacted the "Automatic License Plate Reader System

Act" (the "Act") during its 2013 regular session.  The Act is codified at Ark. Code Ann. §§ 12-

12-1801, *et seq.*  The Act regulates the use of automated high-speed camera systems that convert

images of license plates into computer-readable data and have the capacity to create day-to-day

records of the movements of vehicles and photographs of their occupants and contents.  This

brief will generically refer to such systems as "ALPR systems."  The Act regulates law

enforcement use and bans private use, except in non-public secured areas that are enclosed by

clear boundaries and have limited access.

ALPR systems are a fairly recent development.  They are becoming more common in the

law enforcement community and, as the Plaintiffs point out, have had some benefits to law

enforcement.  The plaintiff Vigilant Solutions, Inc. ("Vigilant") sells ALPR systems to law

enforcement agencies.   Vigilant collects data from law enforcement agencies, which it

apparently "contributes" to an allegedly non-profit national organization, and it sells access to

data that Vigilant acquires from a private entity, plaintiff Digital Recognition Networks ("DRN").   Because the Act permits continued, but restricted, use of ALPR systems by law enforcement, the Act allows Vigilant to continue serving the law enforcement community.

DRN sells ALPR systems to private companies or individuals it refers to as "affiliates." The "affiliates"—usually owners or operators of tow vehicles—install one or more wide angle high speed automated cameras on their vehicles.  These cameras record a photograph of the license plate (and presumably the entire vehicle) of every vehicle encountered.  It appears that most (if not all) of the "affiliates" are engaged in the repossession of automobiles and spend a great deal of their driving time looking for the subjects of repossession requests.

The terms of the related agreements have not yet been disclosed in this litigation, but it appears that the DRN affiliates agree that the information obtained by the system—photographs, dates, times and GPS coordinates - will be uploaded in real time to DRN's computers, where the data is compared to lists of wanted vehicles.  Because they record thousands of images each day, combining the data from multiple ALPR systems can provide "way points" that mark with precision the location of a specific vehicle on different dates or even at different times on the same day.  As a consequence of this, officials and others with access to vehicle registration data can, with a large enough store of data, track the movements of individual vehicles.  Companies such as the lenders and repossession companies that are DRN's customers, and individuals who know the name of a vehicle's registered owner or can visually tie an individual to a license number, can purchase from DRN information that could only be obtained by surveillance or GPS tracking.  The potential intrusions on privacy are obvious.

Because of the potential value of ALPR data to law enforcement officials, the Act permits, but severely constrains, law enforcement uses of ALPR systems.  The Plaintiffs claim

that the information DRN obtains from its affiliates' use of ALPR systems is protected speech, and they request a preliminary injunction barring enforcement of the Act during the pendency of this case.

## PRELIMINARY INJUNCTION STANDARD

Four factors are at issue when courts in the Eighth Circuit consider a request for a preliminary injunction:  (1) the threat of irreparable harm to the movant, (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant, (3) the probability that the movant will succeed on the merits, and (4) the public interest. *Dataphase Systems, Inc. v. CL Systems, Inc.* 640 F.2d 109 (8th Cir. 1981).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Id.* at 112.

In this case, there is no threat of irreparable harm because the Act does not impair protected speech.   But even if the collection of license plate data were protected speech, the balance of harm favors the Defendants, as does the public interest.  The Act has been in effect since August 16, 2013, yet the Plaintiffs did not challenge the Act until May 30, 2014.  Clearly, the harm was not so great as to spur the Plaintiffs to immediate action.  In the meantime, private citizens, not parties to this lawsuit, may have acquired rights under the Act—not just an expectation of greater protection of their privacy, but also a cause of action for any violations. Law enforcement agencies have no doubt attempted to bring their operations into compliance with the Act.   A preliminary injunction would not maintain the status quo; it would fundamentally change the status quo.

Finally, the Plaintiffs cannot demonstrate that they will likely succeed on the merits. First, as demonstrated in the Defendants' Motion to Dismiss, this case must be dismissed because both Defendants are immune from suit and because there is no case or controversy among the parties to this case.  Secondly, as described below, the Act does not affect any right secured by the First Amendment.  If, arguendo, the Act did implicate the First Amendment, it meets constitutional muster.

## I.  THE PLAINTIFFS CANNOT SUCCEED ON THE MERITS

### A.  <u>The Court Lacks Jurisdiction To Issue A Preliminary Injunction</u>

The Defendants have discussed in their Brief in Support of Motion to Dismiss why they are immune from suit, and why there is not a case or controversy between these parties that would otherwise support jurisdiction under Article III of the United States Constitution.  The Defendants will not belabor the point.  Simply put, the Plaintiffs have *no* probability of success on the merits because subject matter jurisdiction is lacking.  But, even if the Defendants were properly sued, the Plaintiffs have not demonstrated any meaningful probability of success on the merits.

### B.  <u>The Act Does Not Regulate Speech</u>

The Plaintiffs' case is built upon the erroneous premise that the gathering and processing of data with no expressive element is protected by the First Amendment to the United States Constitution.  Citing *Sorrell v. IMS Health, Inc.*, ___ U.S. __, 131 S. Ct. 2653 (2011), the Plaintiffs contend that the Arkansas License Plate Reader System Act impairs the exercise of their free speech rights under the First Amendment because it restrains the use of information

they collect from their affiliates.  This contention is incorrect for two reasons: (1) the Act does not directly restrain the use or dissemination of information held by the Plaintiffs; it controls only the use of the camera systems by DRN's affiliates and (2) the Act regulates conduct, not expressive behavior or speech protected by the First Amendment.

### (1)  The Act Does Not Impair The Plaintiffs' Rights To Use Information

The Act prohibits the "use" of an "automatic license plate reader system."  Ark. Code Ann. § 12-12-1803.  The term "automatic license plate reader system" means a "system of one (1) or more mobile or fixed automated high-speed cameras used in combination with computer algorithms to convert images of license plates into computer-readable data."   The scope of this prohibition is determined by giving the words their ordinary and usually accepted meaning in common language.  *Lawhon Farm Services v. Brown*, 335 Ark. 272, 278, 984 S.W.2d 1, 4 (1998).   Arkansas applies the statutory construction rule which dictates that the express designation of one thing may properly be construed to mean the exclusion of another.  *Chem-Ash, Inc. v. Arkansas Power & Light Co*., 296 Ark. 83, 85, 751 S.W.2d 353, 354 (1988).  Read in light of these rules, the Act does not prohibit the use of data that has been lawfully acquired through ALPR systems.  It regulates only the use of the high speed automatic cameras when combined with the described data and digital processing elements.  It does not regulate the Plaintiffs' right to use images of license plates and related information acquired in any other way.

The Complaint does not allege that either Plaintiff directly uses ALPR cameras systems.  According to the Complaint, ALPR camera kits are sold by DRN to independent third parties, who operate the camera systems.  Complaint at ¶ 26.  The data collected by the camera systems

includes a photograph of the license plate, the date, time and location of the photograph.
Complaint at ¶ 22.  The data is then uploaded to DRN, which stores and processes the data.
Complaint at ¶ 21.

Simply put, neither DRN nor Vigilant "use" a system of automated his speed cameras.
Their activities – the collection, processing, storage and sale of data collected by others - are not
regulated by the Act.  No doubt the use of data unlawfully acquired by others may give rise to
some remedy against the Plaintiffs, but the Act itself does not directly constrain the Plaintiffs'
First Amendment rights.

### (2) Use Of An Automatic License Plate Reader System Is Not Speech

The threshold question in assessing the constitutionality of the Act under the First
Amendment is whether it regulates speech at all.  The Plaintiffs propose that the gathering,
assembling, and processing of raw data, with no expressive element, is speech entitled to First
Amendment protection. But the Plaintiffs are not engaged in expressive activities; they create
and distribute a commodity through a process analogous to manufacturing.  They assemble
information which, by itself, has no meaning and combine the raw materials with other
information to create the final product – a record of the locations of automobiles that is tied to a
list or lists of names and vehicles sought by the Plaintiffs' customers.  DRN's affiliates, who
actually use the ALPR systems, are engaged in pure, non-expressive conduct.  The users of
ALPR systems do nothing more than produce modern, electronic widgets, not speech.  Thus, the
Act regulates conduct, not speech.

The Plaintiffs may argue that because the conduct – the gathering of data – results in
information, the data gathering must be protected.  But activity with only a remote connection to

expression is not automatically subject to protection.  "We cannot accept the view that an

apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in

the conduct intends thereby to express an idea." *U. S. v. O'Brien*, 391 U.S. 367, 376-77 (1968)

(holding that the burning of selective service registration cards in protest of war was not

protected).  The Supreme Court has noted that "It is possible to find some kernel of expression in

almost every activity a person undertakes—for example, walking down the street or meeting

one's friends at a shopping mall—but such a kernel is not sufficient to bring the activity within

the protection of the First Amendment."  *City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).   So

it is with ALPR systems.  It is expressive only in the sense that the commodity being collected is

information; but it is information that carries no message.

The Plaintiffs have not demonstrated how the collection of photographs and data by

DRN's tow truck affiliates is expressive conduct covered by the First Amendment.  Their

argument relies not on facts that bring their system within the scope of the First Amendment, but

on a series of inapposite cases dealing with traditional communication of ideas, thoughts, or

other forms of expression.  Their cases say nothing about the gathering of commodity

information with no expressive element.  *Board of Education v. Pico,* 457 U.S. 853 (1982), for

example, involved a school district's ban on particular books, a classic First Amendment issue.

In the *Richmond Newspapers* case, the Court found in the First Amendment a right to attend

criminal trials.  *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980).  *Kaplan v.*

*California* considered "whether expression by words alone can be legally 'obscene' in the sense

of being unprotected by the First Amendment," another classic First Amendment scenario.

*Kaplan v. California*, 413 U.S. 115, 118 (1973).  *United States v. Stevens* simply refused to

extend an obscenity type First Amendment exception to publication of profoundly disturbing

photographs, and found the statute at issue to "create a criminal prohibition of alarming breadth."

*United States v. Stevens*, 559 U.S. 460, 473 (2010).  *Regan v. Time*, 468 U.S. 641 (1984), dealt

with limitations on the publication of photographs of currency by a news magazine.  Each of the

remaining cases cited by the Plaintiffs stands for the relatively unremarkable proposition that

capturing photographs, audio, or video of matters that are of public interest may be

constitutionally protected or that the publication of expressive material may be protected.

      This case presents a unique circumstance.  No binding precedent establishes that the

collection or processing of raw, unexpressive data related to the activities of thousands of

automobiles each day is speech, much less protected speech.  The Plaintiffs do not demonstrate

any probability of success on the merits by advancing such a novel theory.

      The Plaintiffs insist that *Sorrell v. IMS Health* protects their dissemination of license

plate data captured by an ALPR system.  They contend that *Sorrell* conclusively holds that all

information is speech.  But the *Sorrell* Court did not directly confront the issue raised in this

case.  In *Sorrell*, the information at issue was knowledge of medical practices, which is

unquestionably informative, and it was used by the plaintiff for the purpose of promoting clearly

expressive activity – the truthful marketing of its own products.   *Sorrell, 131 S. Ct. at 2663.*

Moreover, the information was acquired through consensual arrangements with parties that

lawfully held the data, not by combing the streets for non-expressive images of unwitting

motorists.

      The Plaintiffs apparently rely on *dicta* in *Sorrell* which notes that "[t]his Court has held

that the creation and dissemination of information are speech with the meaning of the First

Amendment."  *Sorrell,* 131 S. Ct. at 2668.   In support of this statement, the Court cited three

cases.  Each of those cases, however, dealt not with commodity data, but with communications

that consisted of traditional speech.  In *Bartnicki v. Vopper*, 532 U.S. 514 (2001), the Court found that the disclosure and publication of a lawfully acquired (though illegally recorded) conversation that dealt with a matter of public concern was protected.  *Rubin v. Coors*, 514 U.S. 476 (1995), arose from the plaintiff's desire to include truthful information in its advertising – another traditionally protected form of expression.  And *Dunn & Bradstreet v. Greenmoss Builders*, 472 U.S. 749 (1985), related to the publication of a credit report.  In fact, the *Sorrell* Court expressly declined to consider Vermont's request for an exception to the rule that information is speech.  *Sorrell* at 2667.  In short, the Supreme Court has not decided whether data that, by itself, communicates nothing is "speech."

It is clear that, so far, the Supreme Court has not found access to information to be uniformly protected.  *See, e.g., McBurney v. Young*, ___ U.S. ___, 133 S. Ct. 1709, 1718 (2013) (finding no constitutional right to obtain the kind of information available under states' freedom of information laws); *Los Angeles Police Department v. United Reporting,* 528 U.S. 32 (1999) (rejecting a facial challenge to a law restricting access to crime victim addresses); *Houchins v. KQED, Inc.* 438 U.S. 1 (1978) (finding that media access to jail may be limited).

Here, the Plaintiffs' affiliates collect mundane bits of information which, the Plaintiffs claim, are useful to nobody until it is correlated with ownership information for the vehicle license that is photographed.  It is in effect a raw, commoditized input, – not information that by itself has any expressive or speech related value.   The value, and the danger to personal privacy, is the ability to correlate mass collections of this information to view the comings and goings of individuals.

The Plaintiffs argue that, even if the Act does only regulate conduct, it has a prohibited incidental effect on protected speech.  Assuming, arguendo, that this is correct, such a law is

[s]ufficiently justified if it is within the constitutional power of the Government; it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.

*O'Brien¸* 391 U.S. at 377.   As discussed in greater detail *infra*, the governmental interest is substantial, and the Act is properly tailored.

### C.  <u>Even If The Act Impacts Speech, It Passes Constitutional Muster</u>

If the operation of an ALPR system is protected speech, it is commercial speech that is traditionally afforded less protection.   *Central Hudson Gas & Electric v. Public Service Commission*, 447 U.S. 557, 563 (1980).  Where commercial speech is at issue "[t]he first question to ask is whether the challenged speech restriction is content or speaker based, or both." *1-800-411-Pain Referral Service v. Otto*, 744 F.3d 1045, 1054 (8th Cir. 2014).

The principal inquiry in determining whether speech is content neutral is whether the government has adopted a regulation of speech because of disagreement with the message it conveys.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).  Content neutral regulation will be sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than is necessary to further the governmental interests.  *Turner Broadcasting v. F.C.C.*  520 U.S. 180, 189 (1997) (citing *O'Brien,* 391 U.S. at 377).

*Rock Against Racism* is instructive.  The City of New York promulgated use guidelines for a Central Park band shell.  The guidelines attempted to regulate volume and other aspects of performances that had the potential to disturb other areas of the park and the park's neighbors.

Because the guidelines applied to all performances regardless of their quality or content, the guidelines were treated as content neutral and found to be consistent with the First Amendment.

Here, the photographs and data collected by DRN's affiliates convey no message.  To the extent the ALPR Act impacts speech at all, it does so incidentally, without any reference to the content or purpose.  As in *Rock Against Racism,* the Act simply controls, in order to advance an important state interest, the manner in which a right may be exercised.  It is the method of collection that is controlled, not its content.  The ALPR Act applies to all such systems, no matter what other information they may gather. It applies to those, like the Plaintiffs', that capture time, date, and GPS coordinates.  It applies also to those that simply capture images and convert them to computer readable data.

The Act does not restrict its coverage to particular types of licenses or licenses containing only specific messages, such as University of Arkansas license plate or out of state licenses.  So long as the system of acquiring the images and other data fits the definition it is covered, regardless of the nature or content of any other data captured.  On the other hand, the Act leaves open every other lawful method of collecting the same information.

Nor is the Act a speaker-based regulation.  With one very narrow exception for use in secure non-public areas, all private use of ALPR systems is banned.   The intermediate scrutiny test, as outlined in *Turner Broadcasting,* therefore controls this case.

 Where regulation of commercial speech such as advertising or other traditional commercial speech is found to be content or speaker based, a slightly higher standard of review has been applied. *Central Hudson,* 447 U.S. 557.  In the *Sorrell* case, the Court appeared at first blush to say that content or speaker based restrictions would be subjected to "heightened scrutiny." *Sorrell, 131 S. Ct. at 2659.*  Although it attached a seemingly more burdensome title

to the test, the Eighth Circuit has found that *Sorrell* Court actually applied the *Central Hudson* test. *Pain Referral*, 744 F.3d at 1055.   In the Eighth Circuit, then, the *Central Hudson* test must be applied to content or speaker based commercial speech.  Applying this test, the state must demonstrate a substantial interest to be achieved by the restrictions, the regulatory technique must be proportional to the need, the law must be designed to directly advance the state interest, and the law must be narrowly drawn so that it extends only as far as the interest it serves. *Central Hudson,* 447 U.S. at 566. The Plaintiffs' Memorandum in Support of Motion for Preliminary Injunctive Relief ("Plaintiffs' Brief") refers on page 17 to "stringent scrutiny" but cites no authority for the application of such a standard.

As noted, the intermediate scrutiny test applies here because the Act is both content and speaker neutral.  In any event, the Act passes constitutional muster under either "intermediate scrutiny" or the *Central Hudson* test.


### (1) The Act Promotes A Substantial State Interest

The Plaintiffs attempt to set up protection of a privacy interest in publicly available license numbers as the State's interest.  This characterization grossly simplifies the interests at issue.  The Defendants do not dispute that license plate numbers are publicly visible and that, at least in the Fourth Amendment context, there is no reasonable expectation of privacy in a visible license plate number.  There is no doubt that ordinarily a citizen may be entitled to write down the license number of every car he or she views.  Likewise, a citizen may photograph each passing vehicle, so long as her activities do not rise to the level of harassment or some other prohibited activity.  It is not the recording of information that is at issue here; it is the automated high-speed recording of millions of images which, when combined with digital conversion of the

images and a mass of data from across the nation, may create a mosaic displaying the travels and activities of hundreds of thousands of private individuals.  The Act is not about the sort of speech that the Constitution's framers sought to protect; it is about Big Data and its privacy-invading implications for our society.

The citizens and residents of the State of Arkansas, indeed travelers through the state, have an expectation that their activities will not be surreptitiously recorded and placed in a permanent digital record.  They have a legal expectation that the government will make use of records of their movements only when there exists a genuine state interest that outweighs their right to privacy, and that when the government takes action it is subject to the Constitutional limitations that protect their civil rights.  Given the State's long history of protecting personal privacy, individuals present in the State have a reasonable expectation that their images will not be used without their permission, that they will not be placed in a false light in the public eye, and that they will not be subjected to spying by commercial entities with whom they have no relationship, and who are not otherwise subject to the same constitutional and legal limitations as the State.

The Plaintiffs have attempted to limit the State's purpose by reference to statements by the American Civil Liberties Union (ACLU), a news article in the *Arkansas Times*, and a "tweet" by the sponsor of several bills, one of which became the Act.  It should be self-evident that the ACLU has no special insight into the purposes of the Act or the state interest it advances.  Nor is a "tweet" (limited, we understand, to 140 characters) or a newspaper article useful evidence of intent or purpose.  Nor is such information admissible evidence of intent or purpose.

In Arkansas "Legislative History" is gleaned from the act itself.  The Arkansas Courts find that "the testimony of the legislators with respect to their intent in introducing legislation is

clearly inadmissible" and that "little weight should be attached to expressions of individual

members of the legislature or those persons who participated in the drafting of the legislation."

*Cave City Nursing Home, Inc. v. Arkansas Department of Human Services*, 351 Ark. 13, 23, 89

S.W.3d 884, 890 (2002).  The United States Supreme Court has noted that "[w]hat motivates one

legislator to make a speech about a statute is not necessarily what motivates scores of others to

enact it …"  *O'Brien*, 391 U.S. at 384.  The Eighth Circuit has likewise found that no weight

should be attached to *post hoc* attempts to reconstruct legislative intent.  *Discount Records, Inc.*

*v. City of N. Little Rock*, 671 F.2d 1220, 1222 (8th Cir. 1982).

The Plaintiffs imply that the General Assembly has somehow "withheld" or "failed" to

provide legislative findings.  Plaintiffs' Brief at page 27.  The Plaintiffs should know, as no

doubt the Court does, that the Arkansas General Assembly does not maintain a formal record of

proceedings in the same way as the United States Congress.   Legislative findings are not

required, and many of the General Assembly's Acts are not accompanied by findings.

The State of Arkansas holds a substantial interest in protecting the privacy of Arkansans

and in preventing the use of state issued registrations to facilitate invasions of privacy.  As

discussed *infra*, the Act furthers these interests but leaves available other less intrusive means for

acquisition of the data the Plaintiffs seek.

### (a)  The United States Constitution recognizes an expectation of privacy in an individual's movements

The Plaintiffs imply that the federal courts recognize no privacy interest here but, in fact,

the recent trend has been otherwise.  The rapid growth and prevalence of "big data" have led

Courts to consider the effect of combining discrete bits of ostensibly public information in a way

that invades one's privacy.  In *United States v. Jones*, __ U.S. ___, 132 S. Ct. 945 (2012), the

Supreme Court found that attaching a GPS tracking device to a vehicle was a "trespass" that

violated the Fourth Amendment's prohibition on warrantless searches.  Four justices, however,

would have applied a reasonable expectation of privacy in one's movements over an extended

period.  A fifth, Justice Sotomayor, agreed that the "trespass" theory applied, but she also

believed that the tracking implicated a privacy interest.  The concurring opinions artfully

describe some of the privacy interests implicated by tracking and similar technologies.

> GPS monitoring generates a precise, comprehensive record of a person's public
> movements that reflects a wealth of detail about her familial, political, professional,
> religious, and sexual associations. See, *e.g., People v. Weaver,* 12 N.Y.3d 433, 441–442,
> 882 N.Y.S.2d 357, 909 N.E.2d 1195, 1199 (2009) ("Disclosed in [GPS] data … will be
> trips the indisputably private nature of which takes little imagination to conjure: trips to
> the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the
> strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the
> mosque, synagogue or church, the gay bar and on and on").

*Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring).  In the concurring opinion of Justices Alito,

Ginsburg, Breyer and Kagan, Justice Alito noted that:

> But the use of longer term GPS monitoring in investigations of most offenses impinges
> on expectations of privacy. For such offenses, society's expectation has been that law
> enforcement agents and others would not—and indeed, in the main, simply could not—
> secretly monitor and catalogue every single movement of an individual's car for a very
> long period.

*Jones*, 132 S. Ct. at 964.  The D.C. Circuit, which the *Jones* decision affirmed, provided an

additional explanation of how the recording of otherwise public movements implicates the right

to privacy.

> Applying the foregoing analysis to the present facts, we hold the whole of a person's
> movements over the course of a month is not actually exposed to the public because the
> likelihood a stranger would observe all those movements is not just remote, it is
> essentially nil. It is one thing for a passerby to observe or even to follow someone during
> a single journey as he goes to the market or returns home from work. It is another thing
> entirely for that stranger to pick up the scent again the next day and the day after that,

> week in and week out, dogging his prey until he has identified all the places, people,
> amusements, and chores that make up that person's hitherto private routine.

*United States v. Maynard*, 615 F.3d 544, 560 (D.C. Cir. 2010).  Continuing this trend, the

Eleventh Circuit recently held that "cell site location information is within the subscriber's

reasonable expectation of privacy," and found that data obtained without a warrant was a Fourth

Amendment violation.  *U.S. v. Davis*, No. 12–12928, 2014 WL 2599917(11th Cir. June 11,

2014).  The random yet relatively precise time, date, and location information that is aggregated

by ALPR systems is not unlike cell site location information.  Although not as comprehensive as

the GPS tracking at issue in *Jones*, ALPR systems can provider similar evidence of movements

over time.  Just this week the United States Supreme Court applied the expectation of privacy

theory to protect a cell phone seized at the time of arrest from warrantless search.  *Riley v.*

*California*,  Nos. 13-132, 13-212, 2014 WL 2864483 (S. Ct. June 25, 2014).

It is clear that the United States Constitution provides each citizen a right to keep private

his movements over an extended period of time.  The alone supplies a substantial state interest in

regulating ALPR systems.


**(b) Arkansas law provides an even broader privacy right**

The right of privacy granted by the Arkansas Constitution is broader than that provided

by the Fourth Amendment to the United States Constitution.  *Griffin v. State*, 347 Ark. 788, 67

S.W. 3d 582 (2002).  In the civil law context Arkansas also provides a strong expectation of

privacy.

> In considering our constitution together with the statutes, rules, and case law mentioned
> above, it is clear to this court that Arkansas has a rich and compelling tradition of
> protecting individual privacy and that a fundamental right to privacy is implicit in the
> Arkansas Constitution.

*Jegley v. Picado*, 349 Ark. 600, 631-632, 80 S.W. 3d 332 (2002).

Arkansas law has long recognized a variety of privacy rights enforceable against private actors as well as against the government. *Wal-Mart Stores v. Lee*, 348 Ark. 707, 74 S.W.3d 634 (2002). For example, Arkansas' common law provides causes of action for invasion or intrusion upon privacy and false light invasion of privacy. *Dodrill v. Arkansas Democrat Co.*, 265 Ark. 628, 590 S.W.2d 480 (1979); *Olan Mills v. Dodd*, 234 Ark. 495, 353 S.W.2d 22 (1962).

Following another person "in or about a public place" "with purpose to harass, annoy, or alarm another person, without good cause" is a criminal offense. Ark. Code Ann. 5-71-208 (a)(3). DRN's systems may satisfy at least one element of this offense. Arkansas bans "automatic enforcement devices," commonly known as "red light cameras." Ark. Code Ann. § 27-52-110. These cameras are similar in kind to the ALPR systems now banned. The 2013 General Assembly also imposed limits on the ability of employers and institutions of higher education to request social media user names and passwords from students, employees or prospective employees. Ark. Code Ann. §§ 11-2-124, 6-60-104.

The State has long regulated commercial activities that have the potential to disrupt or interfere with its citizen's daily lives. For example, Arkansas, and many other states, regulate the activities of private investigators and private security companies.[1] *See* Ark. Code Ann. §17-40-101, *et seq.* The Supreme Court long ago upheld local authority to regulate private investigators. *Lehon v. City of Atlanta*, 242 U.S. 53 (1916). The activities described in the Complaint appear very much like debt collection, which is also regulated by the State. Ark. Code Ann. § 17-24-101, *et seq.* Tow operators, whose participation is important to the Plaintiffs' businesses, are regulated by the State as well. Ark. Code Ann. § 27-50-1201, *et seq.*

---

[1] The activities described in the Complaint may qualify as such activities, for which qualification and licenses would be required. Neither Defendant, however, is charged with enforcing the law regulating private investigators.

It is beyond dispute that Arkansas holds, and has long recognized, a substantial interest in giving its citizens the rights and tools to protect themselves from intrusions upon their lives and their privacy.  The State must have the power to protect individuals from the prospect that the sum of their movements – time, place, date – will not be recorded by a corporate or government "Big Brother" and maintained in a permanent record regardless of any legitimate need for the information.  The interest is particularly keen in the case of private collection of license data because no substantial state interest is served by the commoditization of such information and private actors are not subject to the same limitations as public actors.

Controlling the commoditization of identifying information issued by the State represents yet another substantial State interest advanced by the Act.  Although publicly displayed, vehicle license plates are part of a system meant to further a governmental purpose – the identification of vehicles for law enforcement and emergency responders, not for the promotion of private commercial interests.[2]  The State issues the plates, specifies size requirements and regulates attachment.  Ark. Code Ann. §§ 27-14-715, 27-14-716.  An owner is not permitted to display any plate not furnished by the State.  Ark. Code Ann. § 27-14-305.  Placing materials over a license making it more difficult to read or reducing its reflective properties is prohibited.  *Id.*  A vehicle may not be operated displaying a license other than the one assigned to that vehicle.  Ark. Code Ann. § 27-14-717.  When the Department of Motor Vehicles cancels, suspends or revokes a registration the license plate is to be returned.  Ark. Code Ann. 27-14-212.  Licenses may not be sold or transferred as personal property.  *Cowan v. State*, 171 Ark. 1018, 287 S.W. 201 (1926).  The Plaintiffs have correctly pointed out that both the State and federal governments have attempted to further corral registration information by regulating access.  Vehicle registrations

---

[2] The Plaintiffs cite *U.S. v. Ellison*, 462 F.3d 557 (6th Cir. 2006), for the proposition that license plates are also issued for the benefit of private actors.  Ellison simply says that "the very purpose is to provide identifying information to law enforcement and others."

18

are not meant to provide information to the public.  The State has a compelling interest in controlling the use of this license plate data.

### (2) The Act Directly Advances The State's Interest

The system sold by DRN to tow operators automatically photographs "everything the camera-equipped vehicle passes during its daily routine of driving on the public streets … looking for automobiles to repossess …"  Complaint at ¶ 18.  License plate scanners can read up to 14,000 plates in a daily shift.  Through a digital process the "system" converts the images of license plates to computer-readable data and checks the result against a database of license plates attributed to vehicles that DRN's clients seek to repossess.  Complaint at ¶ 19.  When there is a match the tow operator is alerted and may be authorized to repossess the vehicle.  Complaint at ¶ 20.  The cameras associate a date, time and GPS coordinates with each photo, all of which is recorded by a computer in the tow vehicle and immediately uploaded to DRN's data center, where it is stored and processed.  Complaint at ¶21.  Plaintiff Vigilant apparently does not participate in the acquisition or processing of the data, but has access to the data so acquired.  Complaint at ¶ 25.  Vigilant does, however, sell ALPR systems to law enforcement agencies.  http://vigilantsolutions.com/products/nvls (June 25, 2014).

The Plaintiffs imply that their systems record only the license number when photographing.  However, according to the "frequently asked questions" portion of Vigilant's website, the system "captures" include color image of vehicles.  http://vigilantsolutions.com/about/vigilant-faq (June 25, 2014).  Presumably these photographs also include the occupants of the vehicles.  Although not directly at issue here, it is noteworthy

that Vigilant also sells facial recognition systems.

http://vigilantsolutions.com/producdts/facesearch_facial_recognition  (June 25, 2014.)

The Complaint, and the Plaintiffs' Brief, paint a glowing picture of the benefits of ALPR systems.  Indeed, there are potentially substantial benefits to law enforcement and, for this reason, the Act preserves, but limits, the rights of law enforcement officials to acquire and use ALPR data.  Vigilant will presumably continue to service the law enforcement segment of the market.

The Plaintiffs do not discuss, however, the potential disadvantages of ALPR systems. The Plaintiffs simply assure the Court that abuses will not occur, and that the data is anonymous because it is not tied to the name of an individual and therefore cannot be used without unlawful access to State controlled databases.  The facts not discussed by the Plaintiffs, however, demonstrate plenty of potential for unwarranted invasions of privacy or disturbing the rights of ordinary citizens to be left alone.

The Plaintiffs' Brief cites a report published by the ACLU: *You Are Being Tracked: How License Plate Readers Are Being Used To Record Americans' Movements* (July 2013)*.  The same report states that, based upon information apparently then posted on DRN's website, DRN's database contained over 700 million data points on where American drivers have travelled.  Vigilant reports that the data it acquires from DRN alone totals 1.8 billion "detections" and grows at a rate of 70 million per month.

http://vigilantsolutions.com/products/nvls  (June 25, 2014).

The Plaintiffs' assurance that the information DRN gathers from tow truck surveillance cannot be misused is hardly comforting.  It is true, of course, that DRN itself does not collect personal identifying information (unless the photograph also captures a person, a home address

or the like).  The connection can be easily made, however.  DRN's customers, who supply the

information for the "hot list" against which data is checked, presumably have some knowledge

that connects an individual to a plate number.  Insurance companies, insurance adjusters,

automobile dealerships, finance companies, perhaps credit reporting agencies, are among the

many who can easily make the connection between a registration number and a person.  It is easy

to associate a person to a number by simply observing them enter or leave their vehicle.

      To say, as the Plaintiffs do, that the information they collect is strictly anonymous ignores

not only the access provided to the Plaintiffs' customers, but also fails to take into account

incidental identifying information that may be captured.  For example, the Plaintiffs claim that

their systems only collect and store license plate data.  But the Plaintiffs do not claim their

systems take photos of *only* license plates and Vigilant's website suggests otherwise.  The proof

will show that the Plaintiffs' systems are based on the use of wide angle cameras which capture

everything within their broad fields of view.  There is no reason the Plaintiffs, or one of their

competitors, could not also store photographs of the occupants of vehicles or the contents of an

open trailer or pickup, all digitally attached to the license plate data.  Moreover, as already noted,

it is no difficult matter to obtain the license number of a known person by simple observation.

Once armed with the information, movements can be tracked by information purchased from the

Plaintiffs.

      Lenders may be interested in simply keeping tabs on the movement of a borrower, just in

case there is a default.   DRN's website implies, in fact, that it offers such a service, which it

calls "Vehicle Location Alerts."   See Exhibit A.  ("Receive up to the minute location updates …

closely monitor high risk accounts … and maintain up to date information on asset locations

…").  DRN's lending and collection customers *do* have significant personal information that is

21

connected to the license number.  While no one can reasonably question the right of a lender to take reasonable steps to locate a vehicle after a default, the prospect of having one's movements tracked, just in case there is a default, is unnerving and reminiscent of the dystopian novels that foretell a time when we are all tracked.

The ability to use ALPR data to track a vehicle's movements is impressive. The *Minneapolis Star Tribune* reported that, over the course of a year, law enforcement license plate readers had spotted the Mayor's city-owned cars 41 times.  *City Cameras Track Anyone, Even Minneapolis Mayor Rybak,* Star Tribune, August 17, 2012. The City of Minneapolis, with eight mobile cameras and two stationary cameras, captured 4.9 million license plates in 2012. According to Los Angeles Times writer Robert Faturechi, in an article published in the *Arkansas Democrat Gazette*, a California Senator demonstrated the personal surveillance properties of ALPR systems by hiring a private investigator who, purchasing access to a database, located the Senator's wife's car, parked 100 miles away.  *License-plate Scans Raise Concern*, Arkansas Democrat Gazette, May 26, 2014.

The Plaintiffs have not identified any limitations on access to the data collected by DRN's affiliates.  It is not difficult to imagine the mischief that can come from private access to such a wealth of information cataloguing the movements of millions of Americans.  Private investigators or individuals can presumably purchase access and track the locations of individuals whom they know to be driving a car with a specific plate number.   Spouses could keep tabs on each other, or on suspected paramours of their spouses.  Employers might contract for data that would allow them to track their employee's movements in their private time to see, much as Henry Ford did, whether their employees live within the bounds of an "approved lifestyle."  Like the GPS data at issue in the *Jones* case, this data provides "a wealth of detail

about … familial, political, professional, religious, and sexual associations" including "trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on." *Jones*, 132 S. Ct. at 955 (Sotomayor, J., concurring).

Compounding the potential invasions of privacy that come from tracking, recording, and maintaining, presumably forever, records of the travels of millions of vehicles, is the potential for grief resulting from mistakes by users or by the systems themselves.  For example, a tow truck driver may repossess a vehicle without waiting for the required approval, or the system may incorrectly identify a vehicle as subject to repossession.  These kinds of mistakes do occur.  In San Francisco, an innocent woman was stopped by police and, at the point of as many six drawn weapons, ordered to exit her vehicle, handcuffed on her knees, and subjected to a search after a license plate reader erroneously reported her vehicle was a wanted vehicle.  *Green v. City and County of San Francisco,* No. 11–17892, 2014 WL 1876273 (9th Cir.  May 12, 2014).  Even in the absence of the Act, the ability of state and local law enforcement officials to use ALPR information is constrained by the U.S. and Arkansas Constitutions and by a multitude of rules and regulations.  There are no such protections against mistakes by private users.

The State's interest, and the relationship of the Act to the interest protected, need not be established by empirical studies, but may be supported by anecdotes, history, consensus, and simple common sense.  *Missouri ex rel. Nixon v. American Blast Fax, Inc.*, 323 F.3d 649, 654 (8th Cir. 2003) (upholding a "junk fax" prohibition against a First Amendment challenge).  The facts related in this brief, and to be established by evidence at trial, demonstrate a strong and

substantial state interest in limiting the use of ALPR systems and that the Act directly advances this important interest.

At this early stage of the litigation, the Defendants possess little admissible evidence of the various ways in which the Plaintiffs acquire and use ALPR systems.  The Defendants believe that, after an opportunity for robust discovery of the Plaintiffs' technologies,  business partners, and day-to-day operations, the evidence will demonstrate that ALPR systems, and particularly private commercial use, pose a substantial and significant danger to the recognized privacy interests of Arkansas' citizens.

Put quite simply, the Act directly advances the States' interest as to private use of ALPR systems in public areas by outright banning them, and it carefully regulates the few remaining uses.  There is no question that the Act directly advances the protection of privacy.


### (3)  The Act Is Properly Tailored

The Act does not attempt to ban or regulate the collection or the use of information.  If affects only the manner in which information may be collected and used.  The Plaintiffs' Brief concedes that "the technique developed by Vigilant is not capable of doing anything that a human cannot and does not already do … .but can do it much faster."  Plaintiffs' Brief at page 7. So long as they do not violate some other law, either Plaintiff is free to record license numbers by ordinary photography (which in many cameras records time, date and GPS coordinates), manually enter the information in a database, or record it on a piece of paper or a computer. They may also record the date, time, and GPS coordinates.  They may then convert the data to computer-readable format, store it in a database and sell it to their customers.  They simply may not use automated high speed cameras combined with the technology specified.   Because it is

concerned with the rapid, near real time, mass aggregation of information that can render mosaics of our lives, the Act regulates only the use of "high-speed cameras used in combination with computer algorithms to convert images of license plates into computer-readable data." Ark. Code Ann. § 12-12-1802(2).  The Act is tailored to limit or ban only this particular method of gathering the data.

The Act is not, as Plaintiffs argue, a "selective ban." It is the opposite.  The Act is a complete ban, with narrow exceptions, of the use of ALPR systems.  At the same time, the Act closely regulates the three designated lawful uses of ALPR systems.  The Act does not prohibit or limit the private use of license plate numbers, dates, times or coordinates acquired in any other way.  It leaves open many other opportunities to exercise whatever right the Plaintiffs may have to record license numbers.

There is no doubt that the Act may have an impact on the efficiency of the Plaintiffs' businesses.  But "… the First Amendment does not guarantee a right to the least expensive means of expression." *Gannett Satellite Information Network, Inc. v. Metropolitan Transportation Authority*, 745 F.2d 767, 774 (2nd Cir. 1984).  The State is not required to demonstrate a perfect fit between the Act and the interests to be protected.  Nor is the State required to demonstrate that the Act is the "least restrictive means." *Board of Trustees v. Fox,* 492 U.S. 469, 480 (1989).  It need only show "a means narrowly tailored to achieve the desired objective. Within those bounds we leave it to governmental decisionmakers to judge what manner of regulation may best be employed." *Id.*

Here, the Act leaves available every other lawful means of acquiring the same information.  By regulating only automated high speed photography combined with digital conversion of photos the Act achieves its purpose by limiting the ability to construct and

maintain, nearly in real time, the movements of tens of thousands of vehicle (each connected to one or more individuals) each day, while leaving the underlying information available for less intrusive uses.

The Act's exceptions are narrow.  The Plaintiffs themselves recognize the potential law enforcement value of automatic license plate readers.  The Act permits, but regulates, use and storage of the information for those who have a legitimate, state related use for the data: law enforcement and parking enforcement entities. [3]  It permits non-governmental actors only one use:  to control access to secure areas.  Obviously the recording of license plate numbers in secure areas, which are by definition not open to the public, does not implicate the public's privacy expectations because those interests do not extend to secure areas.  Nor does collection of ALPR data in a secure facility or a parking lot yield the "mosaic of movements" that can be created by a system of roving automated high speed cameras.

The Plaintiffs assert that the Act has too many exceptions, implying that it carves out exceptions for everyone but the entities operating a business like the Plaintiffs'.  This is simply not correct.  The Act has three exceptions.  All other uses are barred.  Not only is the use proposed by the Plaintiffs' barred, but private investigators, banks, insurance companies, employers, indeed any other private or public actor not specified, is barred from using ALPR systems as defined by the Act.

*Sorrell v. IMS Health* presents a recent example of a law that was fatally under-inclusive because it had too many exceptions.  The Court explained that, under Vermont's law, pharmacies were permitted to share prescriber identifying information with anyone for any reason, except for

---

[3] "Parking enforcement entities" appears to refer to government entities such as the "parking authorities" that may be established by cities and towns under the authority of Ark. Code Ann. § 14-34-103 or the Capitol Parking Control Committee 22-3-405.  The Defendants are not aware of any non-governmental "parking entities" established by Arkansas law.

one.  The information could not be used for marketing.  *Sorrell,* 131 S. Ct. at 2668.  Finding the

law to be too broad to achieve a constitutional "fit" between the law and its purpose, the Court

noted that:

> "… the State might have advanced its asserted privacy interest by allowing the information's sale or disclosure in only a few narrow and well-justified circumstances. [citations omitted].  As case of that type would present quite a different case than the one presented here.

*Id.*  This is exactly what Arkansas has done with the Act.  It bans all uses of this technology

except for a few carefully regulated instances which directly serve the interests of law

enforcement or management of government facilities (parking entities), or in secure facilities

where there is no expectation of privacy.  "The underinclusiveness of a commercial speech

regulation is relevant only if it renders the regulatory framework so irrational that it fails to

materially advance the aims that it was purportedly designed to further."  *Mainstream Marketing*

*Services v. Federal Trade Commission*, 358 F.3d 1228 (10th Cir. 2004).  These three exceptions

to the ban are in no way irrational.

Interestingly, while arguing that the Act has too many exceptions and is therefore under-

inclusive, the Plaintiffs also contend it is over-inclusive.  They appear to argue that the flat ban

of private use outside of secured facilities renders the Act overbroad.  The Plaintiffs suggest that

something less than a complete ban on private use might pass constitutional muster.    But, in that

case the Act may well suffer from the infirmities that doomed the law in *Sorrell.*  Moreover, as

previously discussed, although the Act imposes a complete ban on the use of ALPR systems, it

does not ban the use of lawfully acquired information.  The Plaintiffs and others are free to

collect the same information by any other means.  And they are free to use the lawfully acquired

information for their commercial purposes.  The Act prohibits only one method of collecting the

information that the Plaintiffs believe is protected speech.

Citing *Florida Star v. B.J.F.,* 491 U.S. 524 (1989), the Plaintiffs claim that the Act is invalid because it targets publication that "efficiently reaches a large audience." First, it is of no consequence under the Act whether the data is accessed by one person or one million. All uses of ALPR systems are regulated, not just mass distribution of the data. Second, *B.J.F.* involved a law that prohibited the publication of a rape victims name in only one place – an "instrument of mass communication." The Supreme Court noted that the law did not further the state's purpose because the same harm would arise from any of the many other avenues of publication not prohibited. In this case the State has identified a process the end result of which presents a serious threat to privacy. The information remains available, but the Plaintiffs have not identified anther method of collecting the information that yields the same kind of real time of movements that kind be readily linked to individuals. Street scenes photographed by appraisers or by Google do not yield the same kind of immediate and real time access.

Other, more restrictive limitations on commercial speech have been approved by the courts. For example, the Eighth Circuit upheld a nearly complete ban on unsolicited commercial fax transmissions. The Court rejected the argument that the failure to regulate non-commercial unsolicited faxes caused the act to be under-inclusive. *American Fax Blast*, 323 F.3d 649. In rejecting the challenge to Missouri's law the Eighth Circuit noted that advertisers remained free to publicize their products through any other legal means. *Id.* at 659. In *Turner Broadcasting* the Supreme Court, in a split opinion, approved an FCC rule requiring cable carriers to include local television stations in their programming. *Turner,* 520 U.S. 180. In *Trans Union, LLC v. F.T.C.*, 295 F.3d 42 (D.C. Cir. 2002), the D.C. Circuit affirmed on First Amendment challenge the validity of FTC regulations that controlled a credit reporting agency's ability to use information it obtains from third parties. The D.C. Circuit noted that the information, potentially

useful in marketing, implicated no public concern and warranted reduced constitutional protection.  *Id.* at 52.  So-called "do not call lists" were approved by the 10th Circuit in *Mainstream Marketing*, 358 F.3d 1228.  *See also Hubbard Broadcasting v. Metropolitan Sports Facilities Commission*, 797 F.2d 552 (8th Cir. 1986) (approving city's grant of exclusive advertising rights in a government owned sports facility); *Jacobsen v. City of Grand Rapids*, 128 F.2d 660 (8th Cir. 1997) (approving municipal airport rule banning all news racks in favor of selling newspapers through the airport gift shop); *Wisconsin Interscholastic Athletic Ass'n v. Gannett Co., Inc.*, 658 F.3d 614 (8th Cir. 2011) (approving exclusive streaming coverage of sporting event).  Noting the "right to speak and publish does not carry with it an unrestricted license to gather information," the Eleventh Circuit has found that a commercial photographer had no constitutional right to photograph for commercial purposes University of Florida graduation ceremonies.  *Foto USA, Inc. v. Board of Regents of the University System of Florida,* 141 F.3d 1032, 1035 (11th Cir. 1998).

The Act is properly tailored to advance the State's substantial interests.  Even if the act of using an ALPR system were protected speech, the Act's regulation of the activity meets the requirements of the First Amendment.

## II.  THE EQUITIES DO NOT FAVOR A PRELIMINARY INJUNCTION

The Act had been the law in Arkansas for ten months by the time the Plaintiffs filed this case.  The Plaintiffs have given no explanation for their delay in challenging Arkansas' law.  It can be fairly assumed that the Plaintiffs found no urgent need to challenge the Act, suggesting

that the potential harm to the Plaintiffs is nominal and their need for an immediate remedy before

a trial on the merits, and even before discovery has commenced, is not compelling.

In the meantime, the Act has become the law of the land in Arkansas.  If there have been

violations of the Act, private rights of action have accrued under the Act against one of the

Plaintiffs' affiliates or some other actor.   Under these circumstances, a preliminary injunction

would not serve its essential function:  preservation of the status quo.  Moreover, because the

Defendants have no power to enforce the Act, an injunction would be meaningless.  Private

citizens, who may hold a cause of action, cannot be enjoined because they are not parties.

Finally, the issuance of a preliminary injunction will allow the Plaintiffs, through their

local "affiliates," to collect and sell millions of "data points" tracking the movements of

automobiles and people in Arkansas while this case moves through the courts.  The unique

nature of the legal issues, and the complicated nature of the technology at issue, suggest that, if

the Defendants' motion to dismiss is not granted, the final disposition of this case may be years

coming.  In that time, the Plaintiffs will have acquired and sold a tremendous amount of data that

cannot be retrieved.  The harm to individuals that could result cannot be measured nor is does the

law provide any mechanism for treating the harm.  Any harm to the Plaintiffs will be purely

monetary.


## II. PLAINTIFFS' REQUEST FOR EXPEDITED ORAL ARGUMENT


The Defendants object to the Plaintiffs' request for expedited oral argument.  First and

foremost, as described in the Defendants' Motion to Dismiss, subject matter jurisdiction is

absent.  Second, the Plaintiffs' motion is not generally susceptible to disposition without the

admission of evidence and thus cannot be decided based on the papers and oral argument.   If the Plaintiffs propose to use supporting affidavits instead of live testimony, the Defendants are nevertheless entitled to cross-examination.   Moreover, Defendants anticipate they will need some time to conduct discovery regarding Plaintiffs' operations and marshal the proof.

## CONCLUSION

The Plaintiffs cannot carry their burden of establishing each of the elements required to justify the issuance of a preliminary injunction.   First, and foremost, they have sued the wrong parties.  As explained in detail in the Defendants' Brief in Support of Motion to Dismiss, both Defendants are immune from suit and, because they have no power to enforce the Act and have not commenced or threatened to commence enforcement action, there is no case or controversy.

Moreover, the Plaintiffs have not demonstrated that the conduct prohibited by the Act is expressive conduct subject to First Amendment protection.  As described in the Complaint and the Plaintiffs' Brief the data collected by their systems is a raw commodity, not an expression of ideas or other matters of public interest, and has no intrinsic communicative value.

Even if the operation of an ALPR system is considered "speech" the Act is consistent with the First Amendment because it directly advances a substantial state interest, and is a properly tailored solution that recognizes few exceptions but leaves the Plaintiffs free to collect and disseminate the same information in other ways.  The Plaintiffs have not demonstrated a meaningful chance of success on the merits.

Finally, a preliminary injunction is not appropriate because it would change the status quo and, if improvidently granted, would irreparably harm the privacy rights of Arkansans.

Respectfully submitted,

DUSTIN McDANIEL
ATTORNEY GENERAL

By:    */s/ Patrick E. Hollingsworth*
PATRICK E. HOLLINGSWORTH
Arkansas Bar No. #84075
Assistant Attorney General
Attorneys for the Defendants
323 Center Street, Suite 200
Little Rock, AR  72201-2610
(501) 682-1051
Patrick.Hollingsworth@arkansasag.gov

### CERTIFICATE OF SERVICE

The undersigned certifies that on June 27, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants, including the following:

| | |
|---|---|
| Jane W. Duke | Michael A. Carvin |
| Mitchell, Williams, Selig, | Ryan J. Watson |
|   Gates and Woodyard, P.L.L.C. | Jones Day Law Firm |
| 425 West Capitol, Suite 1800 | 51 Louisiana Avenue, N.W. |
| Little Rock, Arkansas 72201 | Washington, D.C. |
| jduke@mwlaw.com | mcarvin@jonesday.com |
| | rwatson@jonesday.com |

/s/ Patrick Hollingsworth
PATRICK E. HOLLINGSWORTH

(http://www.linkedin.com/company/digital-recognition.net)  [Login] [Company Updates]  [Contact Us] (/Home/Contact)



(/)

# SmartCollections™

Solutions (/Solutions)

SmartRecovery™ (/Solutions/SmartRecovery)

   LPR$^{2.0}$ Vehicle Recovery (/Solutions/LPRVehicleRecovery)

   Vehicle Location Alerts (/Solutions/VehicleLocationAlerts)

SmartCollections™ (/Solutions/SmartCollections)

   Skip Trace (/Solutions/SkipTrace)

   Address Validation (/Solutions/AddressValidation)

## Optimize the lifecycle of your assets.

It pays to optimize the lifecycle of your assets because once they disappear, so do your chances of collection. **SmartCollections™** suite of skip tracing products reduces the financial impact of customers relocating without your knowledge. Address validation and monitoring reduce lost revenue due to delayed identification of higher risk accounts, decrease charge offs, and reduce operating expenses due to inadvertent or deliberate skips.



Use **SmartCollections™** to:

EXHIBIT A

- **Optimize skip tracing efforts.** Reduce effort searching at multiple locations. Quickly and efficiently identify the most probable addresses.
- **Proactively maintain contact.** Receive alerts on accounts when a potential new location is identified, helping to eliminate inadvertent skips.
- **Accelerate collections on high risk accounts.** Use DRN's proprietary LPR data to enhance your existing risk management process.
- **Improve recovery results.** Secure automotive assets in real time when other collections efforts prove unsuccessful.

© 2014 - Digital Recognition Network

About Us (/AboutUs)

Solutions (/Solutions)

DRN Recovery Network (/RecoveryNetwork)

Site Map (/Home/SiteMap)

EXHIBIT A