# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

| | |
|---|---|
| DIGITAL RECOGNITION NETWORK, INC.; VIGILANT SOLUTIONS, INC.,<br><br>              Plaintiffs,<br><br>v.<br><br>MIKE BEEBE, *in his official capacity as Governor of the State of Arkansas*; DUSTIN McDANIEL, *in his official capacity as Attorney General of the State of Arkansas*,<br><br>              Defendants. | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Civil No. 4:14-CV-00327-BSM |

Pursuant to Local Rule 7.2(b), Plaintiffs Digital Recognition Network, Inc. ("DRN") and Vigilant Solutions, Inc. ("Vigilant") hereby oppose Defendants' Motion to Dismiss the Complaint.

## INTRODUCTION

In an effort to evade judicial review of a law that plainly violates the First Amendment, Defendants contend that there is no Article III case or controversy in this proceeding and that, in any event, Defendants are not subject to suit because they have no connection with the Act's enforcement. Defendants' desire to distance themselves from the Act is understandable and is, in fact, part of an ongoing trend. Specifically, when Plaintiffs raised a similar First Amendment challenge to a Utah law that was materially the same as the Arkansas Automatic License Plate Reader System Act ("the Act"), the Utah Legislature, led by the legislator who originally sponsored Utah's law, promptly backtracked and amended its statute in an effort to preserve private parties' First Amendment rights. *See* Pls.' Mot. for Prelim. Inj. at 4-5 (hereinafter "PI Mot."). Even the American Civil Liberties Union, which initially championed ALPR laws such

as those in Arkansas and Utah, now appears to recognize that they have serious constitutional defects.[1]

Defendants' distancing effort, however, is simply a transparent effort to preclude timely judicial review of a law that currently imposes severe and impermissible burdens on protected speech.  Defendants assert that Plaintiffs "have sued the wrong parties."  Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. at 31 (hereinafter "PI Opp'n").  Yet Defendants give no explanation as to who, in their view, would be an appropriate defendant here.  This shell game is inappropriate when First Amendment rights are at stake.  If Defendants are not the appropriate defendants, then they should explain which state official has a stronger connection with the Act than they do.

In the end, however, what Defendants really mean is not that Plaintiffs "have sued the *wrong* parties," *id.* (emphasis added), but that Plaintiffs have no remedy as against *any* parties—unless, of course, Plaintiffs are sued by private parties under the Act based on the exercise of their constitutional rights.  Adopting Defendants' arguments would allow states to burden and chill constitutionally protected speech but nonetheless deprive the burdened speaker of any means to have the judiciary redress this palpable injury.

Under Defendants' myopic view of federal judicial power (and unduly expansive view of sovereign immunity), states, through the simple expedient of enforcing speech restrictions through private causes of action, are free to pass laws imposing facially unconstitutional speech restrictions on the citizenry and deprive the citizenry of any ability to challenge this unconstitutional speech burden, unless and until the burdened speakers have actually been

---

[1] *See, e.g.*, Adam Orr, *No Expectation of Privacy in Public*, Gaston Gazette (June 7, 2014), *available at* http://www.gastongazette.com/spotlight/no-expectation-of-privacy-in-public-1.329910 (recounting an ACLU spokesperson's statements that "'private citizens do have a First Amendment right to film activities in a public space'"; that, "'[i]n general, when you are in a public space[,] there is no expectation of privacy'"; and that "[l]icense plate readers are legal because plates are in plain view").

prosecuted under the unconstitutional regime through private enforcement.  For example, if the Arkansas General Assembly were to enact a statute authorizing a private person to recover $10,000 in a private suit against anyone who makes a statement that is "politically offensive," that statute would not be subject to a pre-enforcement challenge under Defendants' view, because the statute involves only a private cause of action.  So too would a law authorizing Arkansans to sue anyone who criticizes the Governor evade pre-enforcement review under Defendants' approach.  The result of such a scheme would be that anyone wishing to engage in robust political debate would face a choice between self-censorship or engaging in speech that triggers a substantial risk of civil liability.  But, as the Supreme Court unanimously confirmed just three weeks ago in *Susan B. Anthony List v. Driehaus*, No. 13-193, 2014 BL 165391, 573 U.S. ___ (June 16, 2014) (hereinafter "*SBA List*"), neither Article III nor the First Amendment tolerates a regime imposing such a Hobson's Choice on speakers, by closing the courthouse doors to them until *after* they are exposed to retroactive liability under the speech-suppressing statute.

Thus, under a proper understanding of justiciable controversies, Plaintiffs readily satisfy Article III's case-or-controversy requirement.  Plaintiffs suffer injury in fact because their speech has been chilled by the very credible threat of civil liability they face under the Act.  The fact that the Act can be enforced by thousands of Arkansans, instead of a single prosecutor, only serves to *increase* the credibility of that threat.  Moreover, Plaintiffs' injuries are fairly traceable to the Attorney General and the Governor; indeed, the causal connection is just as direct as it is when a plaintiff challenges a statute that criminalizes certain speech.  Finally, for a host of reasons, it is clear that a favorable judgment here would likely redress Plaintiffs' injuries.  Most obviously, if the Court issues a judgment declaring the Act to be unconstitutional, the Attorney

General would be legally precluded from stepping in to defend the Act's constitutionality in a suit filed by private parties against Plaintiffs. That alone would substantially reduce the probability that a court would uphold the Act in such a suit.

Defendants' connections with the Act's enforcement are sufficient to make them proper parties in this case. This brief delineates numerous connections between Defendants and the Act. For example, the Attorney General has a direct and obvious connection to the Act's enforcement because, when a state statute is challenged as unconstitutional, the Attorney General has a federal right to intervene, to be heard, and to participate fully in the proceeding. Moreover, the Governor has a sufficient connection with the Act because, among other reasons, he signed the Act and, as chief executive of the State of Arkansas, is responsible for the execution of the State's laws.

For the foregoing reasons and those explored more fully below, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

<u>**ARGUMENT**</u>

**I.       AN ARTICLE III CASE OR CONTROVERSY EXISTS IN THIS PROCEEDING.**

Defendants make a cursory argument that no Article III case or controversy exists in this proceeding. *See* Defs.' Br. in Support of Mot. to Dismiss at 12-14 (hereinafter "Mot. to Dismiss Br."). Defendants are wrong. As discussed in detail below, the centerpiece of Defendants' argument—namely, that "there is no case or controversy" because "[n]either Defendant has taken action or threatened to take action against the Plaintiffs," *id.* at 12—is flatly inconsistent with binding precedent. Moreover, Plaintiffs have a straightforward basis for demonstrating each element of Article III standing.

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a

'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *SBA List*, 2014 BL 165391 at *5; *see also 281 Care Committee v. Arneson*, 638 F.3d 621, 627 (8th Cir. 2011).[2] Relatedly, the Supreme Court has explained that, with respect to the case-or-controversy requirement under the Declaratory Judgment Act, the relevant question "'is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007). Plaintiffs readily satisfy these standards.

### A. Plaintiffs Are Currently Suffering Injury In Fact.

Plaintiffs' speech is clearly burdened now because they face at least a credible threat of civil liability under the Act if they choose to speak.  In addition, the Act dramatically impedes— indeed, forecloses—Plaintiffs' ability to conduct their businesses in Arkansas.  Each of these constitutes an injury in fact.

### 1. Plaintiffs' speech has been chilled because they face a credible threat of civil liability under the Act.

Courts routinely allow pre-enforcement review based on a credible threat of enforcement of a speech-suppressive law, based simply on the existence of the suppressive statute and a party's intent to take action that arguably violates it.  Pre-enforcement review is required in such circumstances because "denying prompt judicial review would impose a substantial hardship on [speakers], forcing them to choose between refraining from" constitutionally protected "speech on the one hand, or engaging in that speech and risking costly . . . proceedings" on the other. *SBA List*, 2014 BL 165391 at *11.  Plaintiffs in this case face just such a choice, and they suffer

---

[2] As the Supreme Court recently reiterated, "[t]he doctrines of standing and ripeness 'originate' from the same Article III limitation." *SBA List*, 2014 BL 165931 at *5 n.5.  This brief "use[s] the term 'standing,'" as did the Supreme Court in *SBA List*. *See id.*

injury in fact no matter what they choose.   On the one hand, Plaintiffs could refrain from engaging in constitutionally protected speech in Arkansas, in which case the Act's burden on speech would have succeeded in silencing Plaintiffs—which is clearly a cognizable injury.   On the other hand, Plaintiffs could choose to exercise their First Amendment rights in Arkansas in defiance of the Act, in which case they plainly would be injured by exposing themselves to what is, at a minimum, a credible threat that they will suffer the Act's civil liability damages.

Since *either* compliance with *or* defiance of the Act imposes a current injury on Plaintiffs, it is well-established that speakers suffer cognizable Article III injury *before* speech-restricting laws are actually *enforced* against Plaintiffs.   Rather, a credible threat of enforcement creates current injury and a justiciable controversy.   Simply put, the inevitable consequence of a statutory regime that suppresses speech is self-censorship, and that self-censorship is a constitutional injury.   The Eighth Circuit has repeatedly underscored this point.   *281 Care Committee*, 638 F.3d at 627 ("Self-censorship can itself constitute injury in fact."); *Zanders v. Swanson*, 573 F.3d 591, 593 (8th Cir. 2009) ("We acknowledge that in this context the 'chilling effect alone may constitute injury.'"); *St. Paul Area Chamber of Commerce v. Gaertner*, 439 F.3d 481, 487 (8th Cir. 2006) ("The chilling of Appellants' First Amendment rights is . . . an injury that supports their standing to bring suit."); *see also New Hampshire Right to Life PAC v. Gardner*, 99 F.3d 8, 13, 14 (1st Cir. 1996) ("an actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences," in which case "the vice of the statute is its pull toward self-censorship").   Thus, the threat of enforcement constitutes an injury in fact.   *See, e.g.*, *SBA List*, 2014 BL 165391 at *6; *Gardner*, 99 F.3d at 13; *Okpalobi v. Foster*, 244 F.3d 405, 434-36 (5th Cir. 2001) (*en banc*) (Benavides, J., concurring in part and dissenting in part) (concluding that

plaintiffs suffered injury in fact through the threat of private suits and because of the statute's chilling effect).

The Supreme Court and Eighth Circuit have repeatedly explained that, in pre-enforcement challenges such as this, "a plaintiff satisfies the injury-in-fact requirement where he alleges [1] 'an intention to engage in a course of conduct arguably affected with a constitutional interest, [2] but proscribed by a statute, and [3] there exists a credible threat of prosecution thereunder.'" *SBA List*, 2014 BL 165391 at *6 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *281 Care Committee*, 638 F.3d at 627 (same); *Gaertner*, 439 F.3d 485 (same).[3]  A credible threat of enforcement exists so long as the threat is "not imaginary or wholly speculative." *Gaertner*, 439 F.3d at 485 ("A plaintiff who alleges a threat of prosecution that 'is not imaginary or wholly speculative' has standing to challenge the statute."); *see also Babbitt*, 442 U.S. at 302 ("when fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute") (internal quotation marks omitted). Specifically, "when dealing with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible threat of prosecution in the absence of compelling

---

[3] Although the Supreme Court and the Eighth Circuit have repeatedly applied this standard, Defendants do not acknowledge—let alone apply—it.  Instead, Defendants conjure up a test that is inconsistent with binding precedent:  They contend "there is no case or controversy" here because "[n]either Defendant has taken action or threatened to take action against the Plaintiffs." Mot. to Dismiss Br. at 12.  But, because Arkansas has decided to vest *all* affected citizens with the ability to enforce the Act against Plaintiffs, they face a credible threat regardless whether Defendants themselves have issued such threats.  *See SBA List*, 2014 BL 165391 at *6; *infra* at pp. 8-9.  In any event, the Eighth Circuit has squarely held that, "[t]o establish injury in fact for a First Amendment challenge to a state statute, a plaintiff need *not* have been actually prosecuted or threatened with prosecution." *281 Care Committee*, 638 F.3d at 627 (emphasis added); *Gaertner*, 439 F.3d at 485 (holding that there was a credible threat notwithstanding that plaintiffs "ha[d] neither violated the Minnesota Statutes nor been threatened by Appellees with prosecution should they engage in the proposed activity").

contrary evidence." *Gardner*, 99 F.3d at 15.   This presumption can be overcome only by "evidence—via official policy or a long history of disuse—that authorities actually reject a statute," *281 Care Committee*, 638 F.3d at 628 (noting that defendants had not "established a long history of disuse").   *See SBA List*, 2014 BL 165391 at *9 ("respondents have not disavowed enforcement if petitioners make similar statements in the future"); *Babbitt*, 442 U.S. at 302 ("the State has not disavowed any intention of invoking the criminal penalty provision against unions that commit unfair labor practices"); *Gaertner*, 439 F.3d at 485 (noting that defendants had not disavowed enforcement); *281 Care Committee*, 638 F.3d at 628 (same).

The fact that a speech-suppressive statute creates a threat of civil suits instead of criminal prosecution does not eliminate injury in fact.   On the contrary, the Supreme Court has made clear that "[t]he fear of damage awards under a rule" applied in a civil action "may be markedly *more inhibiting* than the fear of prosecution under a criminal statute."   *New York Times v. Sullivan*, 376 U.S. 254, 277 (1964) (emphasis added); *see also id.* (concluding that "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel").   Similarly, the Supreme Court's decision in *MedImmune* confirms that the same Article III rules apply to those "litigants challenging threatened *private* enforcement action" as apply to those challenging "threatened *government* enforcement action."   549 U.S. at 128-29, 134 n.12; *see also id.* at 130 (noting that courts have found declaratory judgment actions to be justiciable where "the plaintiff's self-avoidance of imminent injury is coerced by threatened enforcement action of a *private party* rather than the government").

Indeed, the Supreme Court reaffirmed in *SBA List* that the fear of civil liability has a *more substantial* inhibiting effect on speech than does the threat of prosecution.   The law at issue in *SBA List* authorized "any person" to file a complaint alleging that a "false statement" had been

made during a political campaign.  2014 BL 165931 at *2.  After the filing of such a complaint, if the Ohio Elections Commission determined there was clear and convincing evidence of a violation, the Commission could either reprimand the violator or refer the matter to a prosecutor. *Id.*  In reversing the Sixth Circuit's contrary reasoning, the Supreme Court held that "[t]he credibility of that threat [of enforcement] is *bolstered* by the fact that authority to file a complaint with the Commission is not limited to a prosecutor or an agency."  *Id.* at *9 (emphasis added); *see also New York Times*, 376 U.S. at 278 (concluding that the civil law at issue was "a form of regulation that creates hazards to protected freedoms markedly *greater* than those that attend reliance upon the criminal law") (emphasis added; internal quotation marks omitted).[4]

Common-sense rationales underlie the Supreme Court's holdings that a threat of civil liability may be more inhibiting than a threat of criminal prosecution.  For instance, defendants in criminal proceedings typically enjoy "safeguards such as the requirements of an indictment and proof beyond a reasonable doubt," which "are not available to the defendant in a civil action."  *New York Times*, 376 U.S. at 277.  In addition, "since there is no double-jeopardy limitation applicable to civil lawsuits," multiple judgments may be awarded against Plaintiffs. *Id.* at 277-78.  And "[w]hether [Plaintiffs] can survive a succession of such judgments, the pall of fear and timidity imposed upon" speakers subject to the challenged statute "is an atmosphere in which the First Amendment freedoms cannot survive."  *Id.* at 278.

---

[4] Numerous additional cases recognize that non-criminal consequences of a challenged statute can affect the reasonableness of the chill asserted by plaintiffs.  *See Ohio Civ. Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 625 n.1 (1986) ("If a reasonable threat of prosecution creates a ripe controversy, we fail to see how the actual filing of the administrative action threatening sanctions in this case does not."); *Babbitt*, 442 U.S. at 302 n.13 (considering "the prospect of issuance of an administrative cease-and-desist order . . . or a court-ordered injunction . . . [as] additional support for the conclusion" that a constitutional challenge was justiciable); *281 Care Committee*, 638 F.3d at 630 (citing cases involving administrative sanctions and civil penalties).

*          *          *

In the present case, Plaintiffs plainly satisfy the three-pronged standard that the Supreme Court reaffirmed in *SBA List*.  Under the first prong of that standard, Plaintiffs intend to engage in a course of conduct that is arguably affected with a constitutional interest.  It is undisputed that, prior to the Act taking effect, Plaintiffs exercised their First Amendment rights relating to the collection and dissemination of ALPR data in Arkansas.  Compl. ¶¶ 26-31; Hodnett Decl. ¶¶ 9-12; Smith Decl. ¶¶ 8-10.  Likewise, it is undisputed that, were it not for the Act, Plaintiffs and their affiliates would resume their collection and dissemination of captured license-plate data using ALPR systems within Arkansas.[5]  This course of conduct is at least "arguably affected with a constitutional interest."  *SBA List*, 2014 BL 165391 at *6.  Indeed, Plaintiffs have filed this lawsuit on the theory that the Act violates their First Amendment rights, and the precedent discussed in their motion for a preliminary injunction establishes that banning the collection and dissemination of ALPR data is at least "arguably" a constitutional violation.  *See* PI Mot. at 1-6, 13-37.  Further underscoring the fact that the Act at least "arguably" protects Plaintiffs' speech is the fact that the Utah Legislature recently amended its materially similar ALPR statute after realizing that it was flatly unconstitutional.  *See id.* at 4-5.  In all events, Plaintiffs' assertions about the merits must be accepted as true for the purpose of assessing standing.  *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 834 (8th Cir. 2009) ("When a party seeks to dismiss

---

[5] Hodnett Decl. ¶ 15; Smith Decl. ¶ 13; Compl. ¶¶ 54-56.  Additionally, were it not for the Act, DRN and its camera affiliates would collect license-plate data using ALPR systems in Arkansas, and DRN would then generate revenue by selling this data to clients such as automobile lenders and insurance companies.  Hodnett Decl. ¶ 15.  Were it not for the Act, DRN also would seek to sell additional camera kits in Arkansas, thus generating further revenue.  *Id.*  Finally, but for the Act, Vigilant would receive Arkansas-based ALPR data from DRN and would disseminate it to law enforcement agencies. Hodnett Decl. ¶ 15; Smith Decl. ¶ 13.

a suit for lack of standing, we 'must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'").

Under the second prong of the standard applied in *SBA List*, Plaintiffs' desired speech is not just "arguably," but indisputably proscribed by the Act.  *See SBA List*, 2014 BL 165391 at *8.  As explained in Plaintiffs' motion for a preliminary injunction, the Act prohibits Plaintiffs from using ALPR systems to collect and disseminate license-plate data.  PI Mot. at 10-12; *see, e.g.*, Ark. Code § 12-12-1803(a) (providing that, except with respect to the enumerated exceptions, "it is unlawful . . . to use an automatic license plate reader system").  In fact, Defendants effectively concede that Plaintiffs' desired speech falls within the scope of the Act. *See* Mot. to Dismiss Br. at 3 (opining that "the system sold by DRN appears to be an automatic license plate reader system within the scope of the Automatic License Plate Reader System Act").  In any event, Defendants certainly do not take the position that the Act is inapplicable to Plaintiffs' speech.

Under the third prong of the standard reiterated in *SBA List*, Plaintiffs face a credible threat of enforcement under the Act.  The prospect of being held liable under the Act if they collect and disseminate license-plate data using ALPR systems in Arkansas is far from imaginary or speculative.  In fact, Defendants have stated that Plaintiffs "record thousands of images each day," Mot. to Dismiss Br. at 2, which effectively is an acknowledgment that the universe of potential plaintiffs is vast.  Moreover, the Act is necessarily premised on the conclusion that each individual whose license plate is photographed with an ALPR system has been "injured," *see* Ark. Code § 12-12-1807 (creating the cause of action); otherwise, there would be no legitimate reason to restrict Plaintiffs' speech in the name of protecting the  "privacy" of those whose license plate has been so photographed.

Defendants cannot—and, indeed, do not even try to—overcome the presumption of a credible threat of enforcement.  There has not been a long history of disuse under the Act, which took effect less than eleven months ago.  Nor have Defendants disavowed the fact that the Act authorizes citizens throughout Arkansas to sue Plaintiffs for exercising their First Amendment rights.

Finally, in light of the authorities discussed above, the fact that a lawsuit filed under the Act would be initiated by a private party bolsters—rather than undermines—the credibility of the threat in this case.  Here, as in *SBA List*, "[b]ecause the universe of potential complainants is not restricted to state officials . . . , there is a real risk" that private parties will file civil actions under the challenged statute.  *See SBA List*, 2014 BL 165391 at *9.  This credible threat of liability, as well as its chilling effect, satisfy the injury-in-fact element of Article III standing.

### 2.     The Act's impact on the efficiency of Plaintiffs' businesses constitutes an injury in fact.

In addition to the fact that Plaintiffs' speech is being chilled due to a credible threat of civil liability under the Act, Plaintiffs are suffering another type of injury in fact.  Specifically, the Act dramatically impedes the Plaintiffs' businesses in Arkansas.  In fact, Defendants have expressly acknowledged that "[t]here is no doubt that the Act may have an impact on the efficiency of the Plaintiffs' businesses."  PI Opp'n at 25.  This concession is consistent with the Eighth Circuit's holding "that a plaintiff 'suffers Article III injury *when it must either make significant changes to its operations* to obey the regulation, or risk a criminal enforcement action by disobeying the regulation.'"  *Gaertner*, 439 F.3d at 487 (emphasis added).  Here, Plaintiffs have made very significant changes to their operations in Arkansas as a result of the Act:  they, in fact, ceased collecting and disseminating ALPR data within the State.  But even in the unlikely event that Plaintiffs were to attempt to collect or disseminate this data without violating the

12

Act—for example, by sending license-plate spotters to stand on street corners with pens and paper—the resulting inefficiency in Plaintiffs' businesses would constitute injury in fact. *See id.* For this reason, the Court should, consistent with Defendants' concession, hold that Plaintiffs are suffering an injury in fact as a result of the Act's interference with their efficient business operations. *See Mader v. United States*, 654 F.3d 794, 808 (8th Cir. 2011) (*en banc*) (holding that, "in light of [a] recent concession," a plaintiff did "not have standing to assert the . . . claim at issue").

*      *      *

At bottom, the injury-in-fact inquiry in this case is straightforward. Plaintiffs have refrained from constitutionally protected speech because of the Act, under which they face a credible threat of liability. Standing analysis in First Amendment cases allows pre-enforcement challenges based on this type of injury. *See, e.g.*, *281 Care*, 638 F.3d at 630.

**B.      Plaintiffs' Injuries Are Fairly Traceable To The Enactment And Subsequent Defense Of The Act.**

As noted above, the second element of the Article III standing inquiry hinges on whether there is "a sufficient 'causal connection between the injury and the conduct complained of.'" *SBA List*, 2014 BL 165391 at *5. In this case, Plaintiffs' injuries are just as directly caused by the Act as are the injuries that flow from a statute that makes speech a crime.

As an initial matter, the injuries identified above—the chill, the threat of civil liability, and the interference with Plaintiffs' businesses—flow from the very existence of the statute. As the Eighth Circuit has explained, "'[a] plaintiff who mounts a pre-enforcement challenge to a statute that he claims violates his freedom of speech need not show that the authorities have threatened to prosecute him; the threat is latent in the existence of the statute.'" *Gaertner*, 439

13

F.3d at 487 (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)).[6]  Thus, in this case, "Plaintiffs' alleged injury . . . is speech that has already been chilled and speech that will be chilled each time" it refrains from collecting or disseminating ALPR data "because of the very existence of" the challenged statute.  *281 Care Committee*, 638 F.3d at 631.  Simply put, the enactment of the Act (as well as Defendants' subsequent defense of its constitutionality) has created a private cause of action that chills Plaintiffs' speech, imposes a threat of liability, and interferes with the efficiency of their businesses.  *See, e.g.*, *Gaertner*, 439 F.3d at 487.

Notably, the Act, in which the threat of enforcement is latent, was signed last year by Governor Beebe himself.  *See* Lexis History Note Following 2013 Ark. Acts 1491 (April 22, 2013) (noting that the Act was "[a]pproved by the Governor [on] April 22, 2013"); *City & Town: The Official Publication of the Arkansas Municipal League*, Vol. 69, No. 05 (May 2013), *available at* http://www.arml.org/documents/05_2013_CityNTown_WEB_000.pdf (noting that the Act was "[s]igned by the Governor" on April 22, 2013).  Governor Beebe now attempts to wash his hands of any role in the statute, but that does not change the fact that he played an important role in this legislation becoming law.  Additionally, as the chief executive of the State, in whom "[t]he supreme executive power" is vested, *see* Ark. Const. Art. VI, § 2, the Governor has authority to guide the Attorney General's actions with respect to the statute.  *See infra* at § II.B (discussing in detail the Governor's connections with the Act).  This further connects the Governor with the injuries Plaintiffs are suffering.

---

[6] *See also 281 Care Committee*, 638 F.3d at 631; *Zanders*, 573 F.3d at 594 ("In the normal course," as in this case, "the behavior allegedly chilled is the target or object of the challenged statute's prohibitions and 'there is ordinarily little question that the [statute] has caused . . . injury.'") (brackets and ellipsis in the court's opinion); *Gardner*, 99 F.3d at 13 (concluding, in the pre-enforcement context, that "the injury can be traced to the *existence* and threatened enforcement of the challenged statutes"); *Okpalobi*, 244 F.3d at 436 (Benavides, J., concurring in part and dissenting in part) ("The mere existence of the statute causes concrete injury.").

Plaintiffs' injuries also are fairly traceable to the Attorney General, who has taken the position that the Act is constitutional and who would intervene to defend the Act if its constitutionality were challenged in a lawsuit filed under the Act.   Importantly, the Fourth Circuit took this view in a case involving a company's constitutional challenge to a Virginia statute that created a private cause of action.  *See Mobil Oil Corp. v. Att'y Gen. of Va.*, 940 F.2d 73, 76 (4th Cir. 1991).  In that case, Virginia's Attorney General argued that the plaintiff lacked standing because the statute was intended to be enforced by *private* suits.  *Id.*  However, the Fourth Circuit expressly rejected the Attorney General's standing argument—and, in doing so, it noted that a pre-enforcement challenge in these circumstances is "precisely the one for which the Declaratory Judgment[ ] Act was designed."  *Id.* at 75, 76.  After explaining that the Virginia Attorney General had authority to intervene in a civil action to defend the constitutionality of the challenged statute, the Fourth Circuit held that such authority to intervene and defend the law satisfied the relevant standing requirements.  *See id.* at 76.  The plaintiff's injury in fact— namely, its self-censorship based on a credible threat of enforcement—was traceable to the fact that the Attorney General would defend the constitutionality of the law in any private suit filed against the plaintiff.

### C.      Plaintiffs' Injuries Likely Would Be Redressed By A Favorable Decision.

The third element of Article III standing requires Plaintiffs to establish a "'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *SBA List*, 2014 BL 165391 at *7. Plaintiffs satisfy the redressability requirement for three independently sufficient reasons, each of which is discussed below.

First, and most directly, a favorable decision would disable the Attorney General from siding with private litigants that sue Plaintiffs DRN and Vigilant under the Act.  In such a private enforcement suit, the Attorney General would be notified of DRN's or Vigilant's constitutional

challenge to the Act, and would be entitled to be heard in such a suit. *See, e.g.*, Ark. Code Ann. § 16-111-106(b); 28 U.S.C. § 2403(b); *see infra* at § II.A (discussing in further detail the Attorney General's right to intervene and participate in such a case). If the Court in the present case issues a judgment declaring the Act to be unconstitutional, or if the Court enjoins the Attorney General from defending the constitutionality of the Act, he would be legally precluded from stepping in to defend the Act's constitutionality in a suit filed by private parties against Plaintiffs. And, in turn, the Attorney General's failure to defend the Act would make it substantially less likely that a court would uphold the Act, thereby redressing Plaintiffs' injuries. *See Utah v. Evans*, 536 U.S. 452, 464 (2002) (standing existed where "practical consequence" of judgment sought by plaintiff "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly addresses the injury suffered"); *see also id.* at 459 (concluding that, in a suit filed against the Secretary of Commerce challenging the method used in a census, plaintiff had standing even though the President and other officials, and not defendant, had final authority over the census; reasoning that it was substantially likely that the President and other officials would abide by the defendant's calculations, even though they were not bound by them); *Franklin v. Massachusetts*, 505 U.S. 788, 803 (1992) (opinion of O'Connor, J.) (same); *281 Care Committee*, 638 F.3d at 631 (reasoning that, to satisfy the redressability requirement, a plaintiff "need not show that a favorable decision will relieve his *every* injury").

The Fourth Circuit employed this reasoning in *Mobil Oil*. As noted, Virginia's Attorney General contended that the plaintiff lacked standing in *Mobil Oil* because the statute was intended to be enforced by *private* suits. 940 F.2d at 76. The court squarely rejected the Attorney General's argument. Because the Attorney General had authority to intervene in a civil action to defend the constitutionality of the challenged law, the court held that plaintiff could

establish standing to bring its pre-enforcement challenge to the law. *See id.* In other words, declaring the law unconstitutional would effectively prevent the Attorney General from intervening to defend the law in a private suit, and this would redress plaintiff's injury in the same way as would an injunction against an Attorney General's enforcement of a criminal law. *See id.*

Second, a declaratory judgment or injunction issued in the present case would likely redress Plaintiffs' injury because it would create precedent that binds federal judges in Arkansas and that controls Arkansas state judges' assessment of the Act's constitutionality. In other words, an injunction or declaration would prevent judges from imposing damages in a private action filed under the Act.

The redressability analysis assumes that a plaintiff will prevail not only in the district court, but also on appeal. (Otherwise the risk of appellate reversal would mean that the district court could not redress *any* alleged injury and no one would ever have standing.) The question is thus not whether *this Court's* ruling that the Act is unconstitutional would redress Plaintiffs' injury, but whether such a ruling *affirmed by the Eighth Circuit and the Supreme Court* would. Defendants cannot reasonably dispute that it would. If the Supreme Court or the Eighth Circuit holds the Act is unconstitutional, that will be settled law and any suit by the private parties seeking the opposite ruling will be effectively foreclosed. *Malvern Gravel Co. v. Mitchell*, 238 Ark. 848, 854 (1964) (holding that the Arkansas Supreme Court is "bound by the decisions of the Federal Courts" on a federal issue). That is, if Plaintiffs were to prevail on appeal, the result of this case would be a binding legal rule that would prevent application of the Act in a private damages action. It therefore does not matter that the potential-citizen-plaintiffs are not parties here, because they cannot obtain damages under the Act unless a judge awards them—and a

ruling by the Supreme Court or the Eighth Circuit that the Act is unconstitutional would eliminate or substantially reduce the probability that judges would award such damages.

In connection with this argument, it bears repeating that the redressability inquiry asks only whether, if a plaintiff is correct on the merits, a favorable ruling would "likely" redress his injury. *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Thus, Plaintiffs "need not negate every conceivable impediment to effective relief no matter how speculative, nor are they required 'to *prove* that granting the requested relief is *certain* to alleviate' their injury." *Int'l Ladies' Garment Union v. Donovan*, 722 F.2d 795, 811 (D.C. Cir. 1983). The Supreme Court has accordingly found standing so long as "the practical consequence of [the favorable ruling] would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Evans*, 536 U.S. at 464. The critical question, in short, is not whether it is *hypothetically conceivable* that a plaintiff's injury might still occur even if he wins his suit, but rather whether it would *likely* still occur. Obviously, if the Eighth Circuit or the Supreme Court holds that the Act is unconstitutional, a hypothetical suit by a citizen of Arkansas is extraordinarily unlikely to be brought or to succeed.

Third, Defendants have expressly conceded that the chilling effect on Plaintiffs' speech would be redressed by the issuance of an injunction in the present case. Just ten days ago, Defendants filed a brief in which they conceded that "the issuance of a preliminary injunction will allow the Plaintiffs, through their local 'affiliates,' to collect and sell" ALPR data. PI Opp'n at 30. This is an unequivocal admission that this Court does, in fact, have the power to redress Plaintiffs' injury. Thus, even if the Court does not agree with the two independently sufficient redressability arguments discussed above, the Court should at least give effect to Defendants' concession and hold that the redressability element of Article III standing has been established.

*See Mader*, 654 F.3d at 808 (holding that, "in light of [a] recent concession," a plaintiff did "not have standing to assert the . . . claim at issue").

## II.    DEFENDANTS ARE SUBJECT TO SUIT.

In addition to contending—erroneously—that there is no Article III case or controversy here, Defendants assert they are not "subject to suit" because they have no "connection" with the Act's enforcement.  Mot. to Dismiss Br. at 4, 6 (capitalization altered and emphasis omitted).  This argument is misplaced.

The Eleventh Amendment generally bars suits in federal court against states and state officials.  *E.g.*, *281 Care Committee*, 638 F.3d at 632.  An exception to this rule has been carved out by *Ex Parte Young*, 209 U.S. 123, 160 (1908), and its progeny.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *281 Care Committee*, 638 F.3d at 632.  Under *Ex Parte Young*, state officials can be sued in their official capacities to enjoin a prospective action that would violate federal law.  *Pennhurst*, 465 U.S. at 102; *281 Care Committee*, 638 F.3d at 632; *Reproductive Health Servs. v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005).[7]

"Here, there is no dispute that the relief plaintiffs seek is prospective."  *281 Care Committee*, 638 F.3d at 632.[8]  Thus, the relevant question is whether the Attorney General and

---

[7] Defendants characterize the "rule of *Ex Parte Young*" as one "which *may* in some circumstances permit a suit to enjoin an official from taking action that violates the United States Constitution."  Defs.' Mot. to Dismiss at 1 (emphasis added).  But it is not accurate to say that this doctrine "*may* in some circumstances" permit such a suit; rather, it is black-letter law that the doctrine *does* permit such a suit.  *E.g.*, *Pennhurst*, 465 U.S. at 102 ("Since the State could not authorize the action, the officer 'was stripped of his official or representative character and [was] subjected in his person to the consequences of his individual conduct.'") (quoting *Ex Parte Young*, 209 U.S. at 160).

[8] In passing, Defendants cite *Will v. Department of State Police*, 491 U.S. 58 (1989), as ostensible support for the assertion that "a state officer sued in an official capacity" is not "a 'person' subject to suit under 1983."  Mot. to Dismiss Br. at 4.  But, the Supreme Court expressly declared in *Will* that "[o]f course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official capacity actions for

Governor have "some connection" with the Act's enforcement.  *See, e.g.*, *id.* ("[T]o be amenable for suit challenging a particular statute the attorney general must have 'some connection with the enforcement of the act.'") (quoting *Reproductive Health Servs.*, 428 F.3d at 1145-46; *Missouri Pro. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 807 (8th Cir. 2007).  This inquiry— which is designed merely to prevent random, unconnected state officials from erroneously being named as defendants in a suit challenging a law—is not particularly stringent.  For example, although courts "do require 'some connection' between the attorney general and the challenged statute, that connection does not need to be primary authority to enforce the challenged law." *281 Care Committee*, 638 F.3d at 632 (citing *Missouri Pro. & Advocacy Servs.*, 499 F.3d at 803). "Nor does the attorney general need to have the full power to redress a plaintiff's injury in order to have 'some connection' with the challenged law."  *Id.* at 633.  As discussed below, the Attorney General and the Governor have "some connection" with the Act's enforcement.

### A.    The Attorney General Has A Sufficient Connection With The Act.

First, and dispositively, the Attorney General has "some connection" with the Act's enforcement because, when a state statute is challenged as unconstitutional, the Attorney General has rights to intervene, to be heard, and to participate fully in the proceeding.  Specifically, under Arkansas law, "[i]n any proceeding" in which a "statute, ordinance, or franchise is alleged to be unconstitutional, the Attorney General of the state shall also be served with a copy of the

---

(continued…)

*prospective relief* are not treated as actions against the State.'"  491 U.S. at 71 n.10 (emphasis added); *id.* (explaining that "[t]his distinction is 'commonplace in sovereign immunity doctrine'"); *see also Hafer v. Melo*, 502 U.S. 21, 26-27 (1991) (quoting this footnote from *Will* and reiterating that the Court's decision in *Will* "addressed the . . . question whether state officials, sued for *monetary relief* in their official capacities, are persons under § 1983") (emphasis added).  Because Plaintiffs in the present case seek only prospective relief, Defendants are unquestionably "person[s]" within the meaning of § 1983.

proceeding and be entitled to be heard." Ark. Code Ann. § 16-111-106(b).  In addition, the

Attorney General has an affirmative *duty* to defend the State's interests in federal court.  *See* Ark.

Code Ann. § 25-16-703(a) ("The Attorney General shall maintain and defend the interests of the

state in matters before the United States Supreme Court and all other federal courts . . . .").  The

Attorney General's role when intervening and defending a statute's constitutionality is so critical

that the Arkansas Supreme Court reversed an order declaring a statute unconstitutional where the

Attorney General had not been given notice and an opportunity to be heard, thus resulting in

"constitutional arguments [that] were not fully developed."  *Ark. Dep't of Human Servs. v.

Heath*, 817 S.W.2d 885, 886 (1991).

Federal law likewise ensures that the Attorney General will be intimately involved in any

federal litigation that calls into question the constitutionality of a state statute.  Federal Rule of

Civil Procedure 5.1 provides that (1) a party filing a constitutional challenge to a state statute

must promptly file a notice of the constitutional question if the parties do not include the State,

one of its agencies, or one of its officers in an official capacity; (2) a party filing a constitutional

challenge to a state statute must promptly "serve the notice and paper . . . on the state attorney

general if a state statute is questioned"; and (3) the court must certify to the attorney general that

the statute has been called into question.  Fed. R. Civ. P. 5.1(a)(1), (a)(2), (b).  Moreover, as a

matter of federal statute, the Attorney General is entitled to be notified and to intervene in federal

cases questioning the constitutionality of a state statute.  28 U.S.C. § 2403(b) ("In any action,

suit, or proceeding in a court of the United States to which a State or any agency, officer, or

employee thereof is not a party, wherein the constitutionality of any statute of that State affecting

the public interest is drawn in question, the court shall certify such fact to the attorney general of

the State, and shall permit the State to intervene . . . .").  When the Attorney General intervenes,

21

he generally enjoys "all the rights of a party," including those relating to "presentation of evidence" and "argument on the question of constitutionality," insofar as is "necessary for a proper presentation of the facts and law relating to the question of constitutionality." *Id.*

The above-described rights and duties relating to intervention and defense of a state statute's constitutionality are sufficient to establish "some connection" between the Attorney General and the Act's enforcement.  In *Reproductive Health Services*, for example, plaintiffs filed a constitutional challenge against Missouri's "informed consent" statute, which made violations of the statute a misdemeanor and which subjected physicians who violated the law to license revocation.  428 F.3d at 1141-42.  The Missouri Attorney General "argue[d] that he is not sufficiently connected with enforcement of [the statute] because he has no power to initiate misdemeanor prosecutions, a task left to local prosecutors, and no power to take adverse licensing actions, a task left to professional licensing boards."  *Id.* at 1145.  Notwithstanding this absence of enforcement authority, the "statutory authority" to intervene and defend statutes "creates a sufficient connection with the enforcement of [the statute] to make the Attorney General a potentially proper party for injunctive relief, in which case he would be within the scope of the *Ex parte Young* exception to Eleventh Amendment immunity."  *Id.* (emphasis and internal quotation marks omitted).  The Eighth Circuit subsequently confirmed unequivocally that, under *Reproductive Health Services*, the Missouri Attorney General's "connection" with the challenged statute was "sufficient," even though he "had no authority to initiate criminal prosecution" and he "could only participate in a criminal proceeding if his assistance was requested by the assigned county attorney or the trial court asked him to sign indictments."  *281 Care Committee*, 638 F.3d at 633; *see also id.* at 625, 626, 632 (holding that, in a pre-enforcement challenge to a statute that proscribed knowingly or recklessly false statements about

proposed ballot initiatives, the Minnesota Attorney General had a sufficient "connection" with the statute for three reasons, one of which was that he could become involved in criminal proceedings brought pursuant to the statute "upon request of the county attorney assigned to a case").

The connection between the Arkansas Attorney General and the Act at issue here is more substantial than the connection the Eighth Circuit held sufficient in *Reproductive Health Services*.   Here, the Attorney General has a right to intervene and defend the Act's constitutionality in any civil suit filed under the Act.   He does not need to wait for the invitation of a court or another government official to become involved, as was the case in *Reproductive Health Services*.   In short, the Attorney General has "some connection" with the Act's enforcement because, when the Act is challenged as unconstitutional in a private enforcement suit, the Attorney General has a right to intervene on the side of the private enforcer of the Act, to be heard, and to participate fully in the proceeding.  *See Reproductive Health Servs.*, 428 F.3d at 1145; *281 Care Committee*, 638 F.3d at 625-26, 632-33.

Second, the Arkansas Attorney General has "some connection" with the Act's enforcement because he is charged with defending state agencies, and it is probable that private parties will sue Arkansas law enforcement agencies for using ALPR data in a way that is inconsistent with the statute.  As explained in Plaintiffs' motion for a preliminary injunction, the Act authorizes any "state, county, or municipal law enforcement agency" to use an ALPR system under certain conditions.   *E.g.*, Ark. Code § 12-12-1803(b) (authorizing law enforcement agencies, "parking enforcement entities," and entities that "control[ ] access to secured areas" to use ALPR systems); PI Mot. at 10-12 & n.11 (discussing restrictions and conditions on ALPR use).  Accordingly, if a law enforcement agency violated one of those conditions—for example,

by retaining ALPR data for a longer period of time than the Act allows—a private party could sue a law enforcement agency or an appropriate official thereof.  *See* Ark. Code § 12-12-1807 (creating a cause of action for violations of the Act); § 12-12-1804(a), (b) (establishing restrictions on how long ALPR data may be retained).  If such a law enforcement agency were sued under the Act, the Attorney General would have a duty to defend that agency in the ensuing litigation.  *See* Ark. Code § 25-16-702(a) ("The Attorney General shall be the attorney for all state officials, departments, institutions, and agencies.  Whenever any officer or department, institution, or agency of the state needs the services of an attorney, the matter shall be certified to the Attorney General for attention."); Ark. Code § 25-16-703(a) ("The Attorney General . . . shall be the legal representative of all state officers, boards, and commission in all litigation where the interests of the state are involved.").[9]  The Attorney General's role in defending such a suit under the Act establishes an adequate connection between him and the statute.  *See 281 Care Committee*, 638 F.3d at 632 (holding the connection between the Minnesota Attorney General and the challenged statute was sufficient because, among other reasons, the Attorney General was responsible for defending a state office's decisions under the statute, in the event that such decisions were challenged in court).

Third, the Arkansas Attorney General has "some connection" with the Act's enforcement because he is charged with advising, and policing the compliance of, state agencies that are authorized to use ALPR systems.  As discussed in the preceding paragraph, law enforcement agencies and certain other governmental agencies are authorized to use ALPR systems, subject to certain conditions.  The Attorney General is responsible for providing "advice" to "state

---

[9] *See also* Ark. Code § 25-16-704(a) (requiring the Attorney General to "maintain and defend the interests of the state in all matters" before the Arkansas Supreme Court); Ark. Code § 25-16-705(a) (providing the Attorney General a subpoena power "[i]n all litigation . . . in which the interests of the State of Arkansas are involved or may become involved").

officials, departments, institutions, and agencies"; for "provid[ing] day-to-day counseling, advice, and representation for state agencies"; and for giving "his or her opinion to the Governor and to the heads of the executive departments . . . upon any constitutional or other legal question that may concern the official action of those officers." Ark. Code §§ 25-16-702(b)(1), 25-16-706(a); *Attorney General: Representing State Agencies*, *available at* http://arkansasag.gov/programs/arkansas-lawyer/representing-state-agencies/ (last visited July 7, 2014). Such a role in policing state agencies' compliance with the Act's restrictions on ALPR use demonstrates a sufficient connection between the Attorney General and the Act's enforcement. The Eighth Circuit has already so held. In *Citizens for Equal Protection v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006), the Circuit squarely held that the Nebraska Attorney General's role in "policing compliance" with a provision established a sufficient connection for *Ex Parte Young* purposes, notwithstanding that the provision did "not require affirmative enforcement by *any* state official." *Id.* (emphasis added).

Fourth, the Attorney General advises the Arkansas General Assembly on the constitutionality of legislation. "When requested," the Attorney General "shall . . . give his or her opinion to either house of the General Assembly and any member thereof upon the constitutionality of any proposed bill and to all state boards and commissions upon any question connected with the discharge of the duties of those boards and commissions." Ark. Code § 25-16-706(a)(3); *see* Ark. Atty' Gen. Op. No. 2003-165 (Aug. 28, 2003) (opinion of then-Attorney General, and now-Governor, Mike Beebe, as to the validity under the First Amendment of legislation relating to license plates). This role gives the Attorney General yet another connection with the Act's enforcement, one necessary component of which involves assessing the Act's constitutionality. *See Bruning*, 455 F.3d at 864 (holding that the Nebraska Attorney

General had "some connection with the enforcement" of a state constitutional provision because he had broad powers to enforce state law and he had issued an opinion stating that a particular bill would violate the challenged constitutional provision).

Fifth, the Attorney General's Office is an authorized user of ALPR systems, thus giving it an additional connection with the Act. As noted above, the Act authorizes a "law enforcement agency" to use ALPR systems for certain purposes. Ark. Code § 12-12-1803(b)(1). As a matter of Arkansas law, "[t]he office of the Attorney General is designated as a law enforcement agency." Ark. Code § 25-16-713(a). Thus, the Attorney General's Office directly benefits from one of the Act's express exceptions, and the Office must comply with the Act's restrictions if it collects or disseminates ALPR data.

### B.      The Governor Has A Sufficient Connection With The Act.

Governor Beebe attempts to portray himself as having no involvement whatsoever with the Act's enforcement. But, of course, Governor Beebe personally signed the Act just last year. In addition, as chief executive of the State of Arkansas, the Governor is responsible for the execution and enforcement of the State's laws. *See* Ark. Const. Art. VI, § 2 ("The supreme executive power of this State shall be vested in a chief magistrate, who shall be styled 'the Governor of the State of Arkansas.'"). These factors demonstrate that the Governor has a sufficient connection with the enforcement of the Act. *See Bruning*, 455 F.3d at 864 (holding that the Nebraska Governor had "some connection with the enforcement" of the state constitutional provision at issue because of his "broad powers to enforce the State's Constitution and statutes," even though the challenged provision did "not require affirmative enforcement by any state official").

What is more, the Governor could order the Attorney General not to defend the constitutionality of the Act. After all, the "supreme executive power" is vested in the Governor,

Ark. Const. Art. VI, § 2, and the Attorney General is part of "[t]he executive department of [the] State," Ark. Const. Art. VI, § 1.  The Governor also has authority relating to the removal of the Attorney General.  *See* Ark. Const. Art. XV, § 3 ("The governor, upon the joint address of two-thirds of all the members elected to each House of the General Assembly, for good cause, may remove the . . . Attorney-General . . . .").  And if the Governor were to order the Attorney General not to defend the constitutionality of the Act, it would not be the first time the Governor has directed the Attorney General's handling of constitutional litigation in Arkansas.  *See Lake View Sch. Dist. No. 25 v. Huckabee*, 340 Ark. 481, 490 (2000) (noting that a representative "of the Attorney General's office stated that the Governor directed the Attorney General to 'pursue . . . the settlement'" in a constitutional case).

Finally, we note that if Defendants really mean what they appear to say—namely, that the State and state officials have nothing whatsoever to do with the Act—then there is no reason not to add the State itself as a defendant here, because doing so will not infringe upon its interests, either through an incursion on its treasury or otherwise.  *See generally Pennhurst*, 465 U.S. at 101 n.11 ("The general rule is that a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act.") (internal quotation marks omitted); *Hafer*, 502 U.S. at 30 ("[T]he Eleventh Amendment bars suits in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury.") (internal quotation marks omitted).

## III.   THE FACT THAT THE ACT DEPUTIZES CITIZENS OF ARKANSAS TO VIOLATE PLAINTIFFS' CONSTITUTIONAL RIGHTS SHOULD NOT BE AN EXCUSE FOR DEFENDANTS TO EVADE JUDICIAL REVIEW.

Adopting Defendants' arguments would mean that states could enact laws that chill speech, all the while evading judicial review unless a plaintiff is willing to risk significant

liability for exercising its First Amendment rights.  But, for the reasons detailed above, *see supra* at § I, requiring speakers to expose themselves to statutory liability as a condition for exercising their First Amendment rights is greatly disfavored and to be avoided if at all possible.  As the Eight Circuit put it, "[w]e 'encourage a person aggrieved by laws he considers unconstitutional to seek a declaratory judgment against the arm of the state entrusted with the state's enforcement power, all the while complying with the challenged law, rather than to deliberately break the law and take his chances in the ensuing suit or prosecution.'"  *See Gaertner*, 439 F.3d at 488 (quoting *Mobil Oil*, 940 F.2d at 75).  Since imposing such a Hobson's Choice on speakers is the inevitable result of Defendants' arguments, they should be rejected.  *See* Caitlin Borgmann, *Legislative Arrogance and Constitutional Accountability*, 79 S. Cal. L. Rev. 753, 776-84 (2006) (arguing that, in such scenarios, suit should be permitted against the Governor and Attorney General, as representatives of the State whose statute is causing the injury); Maya Manion, *Privatizing Bans on Abortion: Eviscerating Constitutional Rights Through Tort Remedies*, 80 Temp. L. Rev. 123, 128, 165-98 (2007) (advocating that courts should permit suits against individual state legislators that pass, and Governors that sign, laws that infringe constitutional rights via a private cause of action, as such laws are "self-enforcing" and effectively "public," rather than "private," violations of constitutional rights).

Moreover, the Supreme Court's "decisions repeatedly have emphasized that the [*Ex Parte*] *Young* doctrine rests on the need to promote the vindication of federal rights." *Pennhurst*, 465 U.S. at 105; *see also id.* (explaining that this "doctrine has been accepted as necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States") (internal quotation marks omitted).  As a result, "the Supreme Court's sovereign immunity jurisprudence does not foreclose [courts'] ability to

vindicate constitutional rights when the existence of a state's self-executing statutory liability scheme places those rights in jeopardy." *Okpalobi*, 244 F.3d at 433 (Benavides, J., concurring in part and dissenting in part).  Moreover, "a principal purpose behind the enactment of § 1983 was to provide a federal forum for civil rights claims." *Hafer*, 502 U.S. at 30.

In short, allowing pre-enforcement review in cases such as this is the only way to provide a fair and timely opportunity for vindication of constitutional rights.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

Dated: July 7, 2014                                    Respectfully submitted,


/s/ Jane W. Duke
Jane W. Duke, Ark. Bar No. 96190
Christopher D. Plumlee, Ark. Bar No. 96154
MITCHELL, WILLIAMS, SELIG,
   GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas  72201
Telephone:  (501) 688-8842
Facsimile:  (501) 918-7842
Email:  jduke@mwlaw.com

Michael A. Carvin (admitted *pro hac vice*)
Ryan J. Watson (admitted *pro hac vice*)
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C.  20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
macarvin@jonesday.com
rwatson@jonesday.com
*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on July 7, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants, including the following:

Patrick E. Hollingsworth
Assistant Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201-2610
(501) 682-1051
Patrick.Hollingsworth@arkansasag.gov
*Counsel for Defendants*

/s/ Jane W. Duke
Jane W. Duke, Ark. Bar No. 96190
MITCHELL, WILLIAMS, SELIG,
    GATES & WOODYARD, P.L.L.C.
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas  72201
Telephone:  (501) 688-8842
Facsimile:  (501) 918-7842
Email:  jduke@mwlaw.com